NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

:

In Re FLEETBOSTON              :      Civil Action No. 02-4561 (GEB)
FINANCIAL CORPORATION     :
SECURITIES LITIGATION        :      **O P I N I O N**

:

**APPEARANCES:**

GARY S. GRAIFMAN, Esq.,
      KANTROWITZ GOLDHAMER & GRAIFMAN, ESQS.
      210 Summit Avenue
      Montvale, New Jersey 07645
      and
JULES BRODY and HOWARD T. LONGMAN, Esqs.,
      STULL, STULL & BRODY
      6 East 45th Street
      New York, New York 10017
      and
JOSEPH H. WEISS, RICHARD A. ACOCELLI and JULIA J. SUN, Esqs.,
      WEISS & LURIE
      551 Fifth Avenue
      New York, New York 10176
      and
SAMUEL H. RUDMAN, ROBERT M. ROTHMAN and EVAN KAUFMAN, Esqs.,
      LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS LLP
      58 South Service Road, Suite 200
      Melville, New York 11747
      and
JOSEPH J. DEPALMA, Esq.,
      LITE, DEPALMA, GREENBERG & RIVAS, LLC
      Two Gateway Center, 12th Floor
      Newark, New Jersey 07102
      and
ROBERT J. BERG, Esq.,
      BERNSTEIN, LIEBHARD & LIFSHITZ, LLP
      2050 Center Avenue, Suite 200
      Fort Lee, New Jersey 07024
Attorneys for Plaintiffs HARRY AMSTERDAM, PHILIP S. AMSTERDAM, ANDREW D.

AMSTERDAM, ARTHUR J. BAUERNFEIND, JENNIFER CHANA FINK, DR. STEPHEN PAUL and the class of all others similarly situated.

JEFFREY A. ROSENTHAL, MITCHEL A. LOWENTHAL, JOSEPH LANDAU and JAMES C. CLARK, Esqs.,

      CLEARY, GOTTLIEB, STEEN & HAMILTON LLP

      One Liberty Plaza

      New York, New York 10006

      and

SCOTT T. TROSS, Esq.,

      HERRICK, FEINSTEIN, LLP

      One Gateway Center, 22nd Floor

      Newark, New Jersey 07102,

Attorneys for Defendants FLEETBOSTON FINANCIAL CORPORATION, TERRENCE MURRAY, CHARLES K. GIFFORD, ROBERT J. HIGGINS, HENRIQUE C. MIEIRELLES, EUGENE M. MCQUADE, ERNEST L. PUSCHAVER, JOEL B. ALVORD, WILLIAM BARNET III, DANIEL P. BURNHAM, PAUL J. CHOQUETTE, JR., WILLIAM F. CONNELL, GARY L. COUNTRYMAN, ALICE F. EMERSON, JAMES F. HARDYMON, MARIAN L. HEARD, ROBERT M. KAVNER, THOMAS J. MAY, DONALD F. MCHENRY, MICHAEL B. PICOTTE, THOMAS R. PIPER, THOMAS C. QUICK, FRANCENE S. RODGERS, JOHN W. ROWE, THOMAS M. RYAN, PAUL R. TREGURTHA, WILLIAM C. MUTTERPERL and JOHN T. COLLINS.


**BROWN, Chief Judge**

      This matter is before the Court (a) upon Plaintiffs' motion ("Plaintiffs' Motion") to expand the class definition, and (b) to supplements the Court's ruling on Defendants' motion ("Defendants' Motion") for partial judgment on pleadings pursuant to Federal Rule of Civil Procedure 12(c), presented to the Court jointly with Plaintiffs' application ("Application") to amend Plaintiffs' Consolidated Amended Complaint ("Complaint"). For the reasons discussed below, Plaintiffs' Motion is construed as two motions, one made pursuant to Federal Rule of Civil Procedure 23(c)(1)(C) and another pursuant to Rule 60(a), and both motions are GRANTED. The previously unaddressed part of Defendants' Motion is construed as a motion for clarification made pursuant to Rule 60(b)(6), which is GRANTED. Plaintiffs' Application to amend the Complaint is DENIED.

## I.  **PROCEDURAL HISTORY**

Plaintiffs filed their original complaint ("Initial Complaint") on September 19, 2002, <u>see</u> Docket Entry No. 1, and the matter was assigned to United States District Judge William G. Bassler ("Judge Bassler") and United States Magistrate Judge Madeline C. Arleo ("Judge Arleo").  <u>See</u> Docket Entry No. 2.

Three and a half months later, the original matter was consolidated with other similar matters, <u>see</u> Docket Entry No. 7, and on April 22, 2003, Plaintiffs filed the Complaint.  <u>See</u> Docket Entry No. 14.  On September 15, 2003, Defendants filed a motion to dismiss the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss").  <u>See</u> Docket Entry No. 16.  On April 23, 2004, Judge Bassler issued an order and accompanying opinion ("April 23, 2004, Opinion"), granting the Motion to Dismiss in part and denying it in part.  <u>See</u> Docket Entries Nos. 28 and 29.  On June 21, 2004, Defendants filed and served their answer to the Complaint.  <u>See</u> Docket Entry No. 34.  One month later, on July 28, 2004, Judge Arleo held a scheduling conference, <u>see</u> Docket Entry No. 35, and the pretrial scheduling order was entered two days later setting the discovery deadline for June 3, 2005.  <u>See</u> Docket Entry No. 37.  Two months thereafter, Plaintiffs filed a motion for class certification ("Plaintiffs' Motion").  <u>See</u> Docket Entry No. 40.  On December 22, 2005, after being presented with a number of Plaintiffs' revisions of the Certification Motion and Defendants' respective oppositions, Judge Bassler held a hearing on the issue ("December 22, 2005, Hearing"), <u>see</u> Docket Entries No. 74 and 78 (minutes entry and transcript entry), and on December 28, 2005, issued an order ("December 28, 2005, Order") and accompanying opinion ("Certification Opinion") certifying the class.  <u>See</u> Docket Entries Nos. 73, 76 and 77 (opinion, order and supplemental order).

On September 20, 2005, three months prior to the December 22, 2005, Hearing, Judge Arleo held a status conference ("September 20 Conference"). Since the issues discussed during Judge Arleo's Conference remained unresolved, Defendants filed Defendants' Motion, pursuant to Federal Rule of Civil Procedure 12(c). See Docket Entry No. 71. Plaintiffs filed Plaintiffs' Opposition ("Plaintiffs' Opposition") to Defendants' Motion on January 31, 2006; Plaintiffs' Opposition included, inter alia, an application for leave to amend the Complaint. See Docket Entry No. 81. Defendants filed their Reply ("Defendants' Reply") on March 17, 2006. See Docket Entry No. 87. On April 28, 2006, Judge Arleo entered a pretrial order closing discovery (with limited exceptions) and halting the proceedings pending Judge Bassler's resolution of Defendants' Motion. See Docket Entry No. 89. However, Judge Bassler retired from the bench prior to resolving the matter, and the case was then transferred to United States District Judge Susan D. Wigenton on July 10, 2006. See Docket Entry No. 90. On March 5, 2007, Judge Wigenton issued an order ("March 5 Order") denying Defendants' Motion with respect to Defendants' challenges as to those Plaintiffs' claims that, pursuant to Judge Bassler's Order, survived Defendants' Motion to Dismiss. See Docket Entry No. 95.

On April 16, 2007, Plaintiffs filed the present Motion, see Docket Entry No. 96, to which Defendants filed an opposition ("Defendants' Opposition") on June 1, 2007. See Docket Entry No. 100. On June 22, 2007, Plaintiffs filed their reply to Defendants' Opposition ("Plaintiffs' Reply"). See Docket Entry No. 101.

On June 27, 2007, this matter was transferred to the undersigned. See Docket Entry No. 102.

## II.   **PLAINTIFFS' MOTION**

### A.   **Procedural Recap**

As noted above, on September 28, 2004, Plaintiffs filed their Class Certification Motion.  <u>See</u>

Docket Entry No. 40.  On December 22, 2005, Judge Bassler held a hearing addressing the parties'

arguments as to whether there was a proper class of Plaintiffs, how such class should be defined and

whether the Lead Plaintiffs qualified as proper class representatives. <u>See</u> Docket Entries No. 74 and

78.  On December 28 and 29, 2005, Judge Bassler issued an order (and accompanying Certification

Opinion) certifying the class.  <u>See</u> Docket Entries Nos. 73, 77.

On April 16, 2007, Plaintiffs filed the present Motion.  <u>See</u> Docket Entry No. 96.

### B.   Background

In their Certification Motion, Plaintiffs defined the putative class as follows:

> All persons or entities who exchanged shares of Summit Bancorp common stock for
> shares of FBF common stock in connection with the merger between FBF and
> Summit, and pursuant to the registration statement and prospectus filed by FBF on
> or about January 25, 2001 for the shares it would be issuing in connection with the
> Merger and who sustained damages as a result of such transactions.  Excluded from
> the Class are defendants; members of the Individual Defendants' immediate families;
> any director, officer, subsidiary, or affiliate of FBF; any entity in which any excluded
> person has a controlling interest; and their legal representatives, heirs, successors and
> assigns ("Proposed Definition").

Plfs.' Mot., Proposed Order at 2.

Judge Bassler, however, certified the following class:

> All persons or entities who exchanged shares of Summit Bancorp common stock for
> shares of FBF common stock in connection with the merger between FBF and
> Summit, and pursuant to the registration statement and prospectus filed by FBF on
> or about January 25, 2001 for the shares it would be issuing in connection with the
> Merger *and sold such shares of FBF common stock between December 21, 2001 and*

*November 7, 2003* and who sustained damages as a result of such transactions. Excluded from the Class are defendants; members of the Individual Defendants' immediate families; and director, officer, subsidiary, or affiliate of FBF; any entity in which any excluded person has a controlling interest; and their legal representatives, heirs, successors and assigns ("Certified Class Definition").

Certif. Op. (In re FleetBoston Fin. Corp. Sec. Litig. ("FleetBoston"), 2005 U.S. Dist. LEXIS 36431, at *13 (D.N.J. Dec. 22, 2005)) (emphasis supplied); see also December 28, 2005, Order at 3. Explaining his reasons for adding the qualifier "[those entities who] sold . . . shares of FBF common stock between December 21, 2001 and November 7, 2003" ("Cut-off Period") to the Proposed Definition, Judge Bassler said that the qualifier was necessary to assure that "the class [was] defined so that it identifie[d] the persons . . . entitled to relief." FleetBoston, 2005 U.S. Dist. LEXIS 36431, at *13. However, the December 28, 2005, Order (issued together with the Certification Opinion) stated that "Plaintiffs shall have leave to make an application to expand the class definition." December 28, 2005, Order at 3.


### C.   PARTIES' CONTENTIONS

In their instant Motion, Plaintiffs allege that

the [Certified Class] Definition . . . differs significantly from the Proposed Definition in that it includes a period during which class members must have sold their stock . . . . The [Cut-off] Period begins on December 21, 2001, the date after FBF disclosed that the economic crisis in Argentina would cost FBF millions of dollars, and ends on November 7, 2003. . . . By delineating the Class by this [Cut-off] Period, the Court excluded a large number of investors who should be part of the Class. . . . [T]he [Certified Class] Definition improvidently narrows the Class by requiring its members to have "sold such shares of FBF common stock between December 21, 2001 and November 7, 2003." [The Certified Class] Definition excludes a large number of proper class members who had sold their FBF shares outside the [Cut-off] Period [i.e., those] who . . . had acquired their FBF shares [as a result of the FBF-Summit Merger] and sold such shares at a loss [before or after the Cut-off Period].

Plfs.' Mot. at 3-4.

Although Plaintiffs indicate that Plaintiffs' Motion is intended to be a Rule 23(c)(1)(C) submission, see Plfs.' Mot. at 13, n. 12, Defendants: (a) characterize Plaintiffs' Motion as a motion for reconsideration, and (b) assert that the Motion should be denied as untimely and for failure to meet the requirements associated with a motion for reconsideration.  See Defs.' Opp. at 17-37. Responding to Defendants' reading of and challenges to their Motion, Plaintiffs filed their Reply, in which they: (a) maintain that Plaintiffs' Motion is properly submitted pursuant to Rule 23(c)(1)(C), and should be assessed as such, see Plfs.' Reply at 2, 17-20, and (b) offer further elaborations on their argument that the Certified Class Definition was erroneous as a matter of law.  See id. at 12-13.

**D.    DISCUSSION**

Plaintiffs' Motion unambiguously indicates that: (a) Plaintiffs move this Court to alter the Certified Class Definition by appending two additions to the Plaintiffs' class, one consisting of the Summit shareholders who sold their FBF shares prior to the Cut-off Period ("Beginning-Date Extension"), and another one consisting of those shareholders who sold their FBF shares after November 7, 2003 ("End-Date Extension"); and (b) Plaintiffs seek to obtain such alteration of the Certified Class Definition under Rule 23(c)(1)(C).  The Court, therefore, should determine whether Plaintiffs' Motion: (a) is properly filed under Rule 23(c)(1)(C) (or should be construed by this Court as an application made pursuant to another rule of Federal Civil Procedure), and (b) qualifies as a motion meriting relief.

### 1. Scope and Requirements of Rules 23(c)(1)(C), 59(e) and 60(a)

#### a. Motion for Reconsideration Pursuant to Rule 59(e)

Rule 59(e) of Federal Civil Procedure, titled "Motion to Alter or Amend Judgment," provides that "[a]ny motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment."[1] Fed. R. Civ. P. 59(e). The Rule was adopted to clarify a district court's power to correct its own mistakes within a short time period immediately following entry of judgment; the Rule applies to every type of judicial decision, regardless of the subject ruled upon. See, e.g., Innovative Home Health Care v. P.T.-O.T. Assocs., 141 F.3d 1284 (8th Cir. 1998). Therefore, the purpose of a Rule 59(e) motion for reconsideration is to correct manifest errors of law or fact (or to present newly discovered evidence). See Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985), cert. denied, 476 U.S. 1171 (1986); Fonseca v. Sherman, 2007 U.S. App. LEXIS 16435, at *4 (3d Cir. July 10, 2007) ("[Rule 59(e) application is a motion, which] raise[s] no new arguments and [which] purpose [is] to re-litigate the original issue") (citing Smith v. Evans, 853 F.2d 155, 158-159 (3d Cir. 1988), and Turner v. Evers, 726 F.2d 112, 114 (3d Cir. 1984)). "To support re-argument, a moving party must show that dispositive factual matters or controlling decisions of law were overlooked by the court in reaching its prior decision." Assisted Living Associates of Moorestown, L.L.C., v. Moorestown Tp, 996 F. Supp. 409, 442 (D.N.J. 1998). Moreover, "[t]he [c]ourt will only entertain [this type of] motion where the overlooked matters [are such that], if considered by the [c]ourt, might reasonably have resulted in a different conclusion." Id.

---

[1] Similarly, Local Rule 7.1 (i) establishes a ten day time limit within which motions for reconsideration must be filed following the entry of the order or judgment on the original motion.

Since a litigant does not need leave of court to make a Rule 59(e) motion (because the Rule itself provides the litigant with the right to make this type of application, see, e.g., United States Fire Ins. Co. v. City of Warren, 87 Fed. Appx. 485, 490 (6th Cir. 2003) (comparing Rule 15, which permits a party to amend its pleading only by leave of the court, to Rule 59(e), which automatically allows a timely motion to alter or amend a judgment)), courts do not include in their orders an express notice that the parties may seek a Rule 59(e) reconsideration of the decision rendered.

### b. Motion to Correct a Clerical Error Pursuant to Rule 60(a)

As with Rule 59(e), Rule 60(a) applies to every type of judicial decision, regardless of the subject that the court ruled upon. Titled "Clerical Mistakes," the Rule provides that "[c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court . . . on its own initiative or on the motion of any party."[2] Fed. R. Civ. P. 60(a). The Rule was adopted to clarify that the "courts have power and duty to correct judgments which contain clerical errors, or judgments which have been issued due to inadvertence or mistake." American Trucking Ass'ns v. Frisco Transp. Co., 358 U.S. 133, 145 (1958). The nature of Rule 60(a) is, however, qualitatively different from that of Rule 59(e), since "Rule 60(a) is concerned . . . with mistakes which do not really attack party's fundamental right to judgment at time it was entered. [Rather, Rule 60(a)] permits the correction of irregularities which becloud but do not impugn [the parties' rights]." United States v. Stuart, 392 F.2d 60, 62 (3d Cir. 1968). In addition, unlike a Rule 59(e) motion, a correction under Rule 60(a) (or an application for

---

[2] Thus, as under Rule 59(e), a party need not obtain leave of court to make a Rule 60(a) motion.

such correction) may be made anytime, "which literally means that power to correct [a] clerical mistake does not depend on [whether Rule 60(a)] motion . . . is made within reasonable time" or long after the judgment. See, e.g., Scola v. Boat Frances, R., Inc., 618 F.2d 147, 152 (1st Cir. 1980).

Notably, the word "clerical" does not imply that Rule 60(a) aims to remedy only ministerial errors, i.e., the errors correctable without judicial involvement. Rule 60(a) also allows correction of clerical mistakes when they are not committed by the Office of the Clerk of Court (or by the chambers' clerical staff), since the Rule is "used to make an order reflect the actual intentions of the court, plus necessary implications." Jones & Guerrero Co. v. Sealift Pacific, 650 F.2d 1072, 1074 (9th Cir. 1981); see also Alpern v. UtiliCorp United, 84 F.3d 1525, 1539 (8th Cir. 1996) (Rule 60(a) "may also be used to correct mistakes by the parties. Where the parties' intentions are clearly defined and all the court need do is employ the judicial eraser to obliterate a mechanical or mathematical mistake," the proper procedural vehicle to perform the modification is Rule 60(a)) (citing Pattiz v. Schwartz, 386 F.2d 300, 303 (8th Cir. 1968), and quoting Matter of West Texas Marketing Corp., 12 F.3d 497, 504-05 (5th Cir. 1994)); Truskoski v. ESPN, 60 F.3d 74, 77 (2d Cir. 1995) (Rule 60(a) permits any correction needed to reflect accurately the decision that court actually made).

### c. *Motion to Alter Class Certification Pursuant to Rule 23(c)(1)(C)*

Pursuant to Rule 23(c)(1)(C), "[a]n order [determining whether to certify a class action] may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Unlike Rule 59(e), Rule 23(c)(1)(C) is narrowly tailored to address only the issue of class certification, and the purpose of the Rule has nothing to do with correcting "manifest errors of law or fact" in the original decision. Rather, as the Notes of Advisory Committee clarify, the goal of Rule 23(c)(1)(C) is to allow the court

to make "[a] determination [whether the previous class certification should] be altered or amended [in view of] development of the facts [that might render] the original determination . . . *unsound*." Notes of Advisory Comm., Subdivision (c)(1) (1966) (emphasis supplied); see Engers v. AT&T, 2005 U.S. Dist. LEXIS 41685, at *2 (D.N.J. Sept. 16, 2005) (citing Zenith Labs., Inc. v. Carter-Wallace, Inc., 530 F.2d 508, 512 (3d Cir. 1976)); see also Richardson v. Byrd, 709 F.2d 1016, 1019 (5th Cir. 1983) (clarifying that a district court is "charged with the duty of monitoring its class decisions in light of the evidentiary developments of the case").

Since neither the Rule nor the case law offers a readily-available definition of the situation when "the original determination [becomes] unsound," Rule 23(c)(1)(C) determinations are made on a case-by-case basis. Therefore, a court presented with a Rule 23(c)(1)(C) motion "is 'obliged to take cognizance of a changed factual situation,'" i.e., to make a comparison between the factual circumstances existing at the time of original certification and those existing at the time of the motion. Engers, 2005 U.S. Dist. LEXIS 41685, at *2 (citing Zenith, 530 F.2d at 512); see also Jaynes v. United States, 69 Fed. Cl. 450, 461 (Ct. Cl. 2006).

Although the language of Rule 23(c)(1)(C) does not specify whether a litigant needs leave to file a Rule 23(c)(1)(C) motion, it appears that the district courts developed a practice of expressly reserving the party's right to seek amendment of the class definition.[3] See, e.g., In re Hydrogen Peroxide Antitrust Litig., 240 F.R.D. 163, 177 (E.D. Pa. 2007) (notifying the litigants that the court

---

[3]

Apparently, the practice ensued from the original language of the Rule which allowed for "conditional" certification. The "conditional certification" was dispensed with as unnecessary when "[t]he provision that permit[ted] alteration or amendment of an order granting or denying class certification [was] amended to set the cut-off point at final judgment rather than 'the decision on the merits.'" Notes of Advisory Comm., Subdivision (c)(1)(C) (2003).

was "prepared to reconsider this decision as further evidence comes to light and will, if necessary, amend the class under Rule 23(c)(1)(C)"); Denney v. Jenkens & Gilchrist, 230 F.R.D. 317, 348 n. 207 (S.D.N.Y. 2005), rev'd in part on other grounds, Denney v. BDO Seidman, L.L.P., 412 F.3d 58 (2d Cir. 2005) (reminding the parties that a class "certification is always contingent on subsequent events and information that may require the court to revisit its decision"); Boylan v. New York Times Co., 1977 U.S. Dist. LEXIS 17243, at *5 (S.D.N.Y. 1977) (same).

Finally, the litigant's right to seek a Rule 23(c)(1)(C) alteration is not limited to a certain period. An application--by definition--is timely when the factual developments within the litigation so changes that the change renders "the original determination . . . unsound." Notes of Advisory Comm., Subdivision (c)(1) (1966); see also McNamara v. Felderhof, 410 F.3d 277, 280 (5th Cir. 2005) ("Rule 23(c)(1)(C) . . . does not bear . . . time limit"); Vengurlekar v. HSBC Bank, 2007 U.S. Dist. LEXIS 37521, at *24 (S.D.N.Y. May 21, 2007) ("Rule 23 (c)(1)(C) allows the Court discretion in altering . . . class certification at any point before a final judgment").

### 2. Beginning-Date Extension

#### a. *The Nature of Plaintiffs' Application*

Although Plaintiffs' Motion dedicates only one footnote sentence to the issue of the procedural rule under which Plaintiffs are making their application, see Plfs.' Mot. at 13, n. 12, Plaintiffs' Reply states, in no ambiguous terms, that Plaintiffs: (a) intend to make an application pursuant to Rule 23(c)(1)(C), and (b) in their view, Rule 23(c)(1)(C) is the proper procedural vehicle to seek alteration of the Certified Class Definition. See Plfs.' Reply at 17-20. Defendants, however, maintain that Plaintiffs' application must be: (a) construed as a motion for reconsideration pursuant

to Rule 59(e), see Defs.' Opp. at 1, because Judge Bassler intended to authorize Plaintiffs to make a Rule 59(e) application, see id. 16-17, and (b) denied as meritless under Rule 59(e), and as untimely under both Rule 59(e) and Local Rule 7.1(i).  See id. at 17-19.

The Court disagrees.  The sentence "Plaintiffs shall have leave to make an application to *expand* the [Certified Class] Definition" ("Leave Statement") in the Order, see December 28, 2005, Order at 3  (emphasis supplied), cannot be reasonably interpreted as a grant of leave to *challenge legal or factual correctness* of the Certified Class Definition under Rule 59(e).  Moreover, neither the language and history of Rule 59(e) nor the common practice of federal judges suggests that Judge Bassler had any reason to grant Plaintiffs express leave to exercise Plaintiffs' rights provided by Rule 59(e) of Federal Civil Procedure, i.e., to file a timely challenge to the Certified Class Definition alleging that Judge Bassler made a manifest error of law or fact.[4]  See Fed. R. Civ. P. 59(e), Local Rule 7.1(i).

By contrast, the language and history of Rule 23(c)(1)(C), as well as the common practice of federal judiciary, suggests that the Leave Statement was made by Judge Bassler to remind Plaintiffs about their Rule 23(c)(1)(C) rights.  Accord Plfs.' Reply at 17-18 (citing Genden v. Merrill Lynch, Pierce, Fenner, & Smith, Inc., 114 F.R.D. 48, 54 (S.D.N.Y. 1987)).  Therefore, the Court declines Defendants' invitation to construe Plaintiffs' application as a Rule 59(e) motion.

---

[4]

Since Plaintiffs' Motion was filed more than fifteen months after the issuance of the December 28, 2005, Order and Certification Opinion, it appears obvious that Plaintiffs elected *not* to pursue a Rule 59(e) challenge.

### b.    Current Soundness of the Certified Class Definition

Under Rule 23(c)(1)(C), Plaintiffs' Motion should focus on the factual developments indicating that the Certified Class Definition has become unsound. See Notes of Advisory Comm., Subdivision (c)(1) (1966). Plaintiffs, however, seem to misunderstand the Rule 23(c)(1)(C) test, since Plaintiffs' key argument reads as follows:

> The [Certified Class] Definition [has become unsound and] should be expanded because [Judge Bassler, in the Certification Opinion explaining the rationale of the December 28, 2005, Order] impermissibly weighed the merits of this [a]ction in contravention of Fed. R. Civ. P. 23(c) . . . and the established case law by determining that those persons who had received shares of FBF in exchange for their shares of Summit through the [FBF-Summit] Merger and sold their shares at a loss outside the [Cut-off] Period could not possibly have been injured by Defendants' alleged [misrepresentations as to the adequacy of FBF's Argentine loan loss reserves at the time of the FBF-Summit Merger. Therefore, Plaintiffs] request[] the Court to expand the class definition by adopting the Proposed Definition.

Plfs.' Mot. at 4-5; see also Plfs.' Reply at 3-11 (clarifying Plaintiffs' belief that Judge Bassler had no right to consider the issue of loss causation at the class certification stage because loss causation is not an element of Plaintiffs' claim but rather an affirmative defense that Defendants may raise).

The foregoing suggests that Plaintiffs believe an application under Rule 23(c)(1)(C) is subject to the same test set forth in Rule 59(e), i.e., whether the court made a manifest error of law or fact. See Fed. R. Civ. P. 59(e). However, the issue of whether Judge Bassler erroneously weighed the merits of Plaintiffs' action is *not* a part of Rule 23(c)(1)(C) inquiry. See Notes of Advisory Comm., Subdivision (c)(1) (1966). If Plaintiffs wished to make such an argument, they had to file a Rule 59(e) application fifteen months before the date Plaintiffs filed of their Motion.[5]    The Court,

---

[5]

It appears that Defendants' misunderstanding as to the nature of Plaintiffs' application ensues from Plaintiffs' utilization of an incorrect legal test. See Defs.' Opp. at 14-17, 20-22.

therefore, will ignore Plaintiffs' quasi-Rule 59(e) arguments and examine the statements made in Plaintiffs' Motion under the test applicable to Rule 23(c)(1)(C) submissions, i.e., whether the development of facts in this litigation has rendered the Certified Class Definition unsound.[6]

---

[6]

    Although the issue of whether Judge Bassler erroneously considered the loss causation aspect of Plaintiffs' action is irrelevant to Rule 23(c)(1)(C) inquiry, the Court notes, in passing, that the case law accumulated thus far suggests that, in order to preserve judicial resources, spare the parties from unnecessary litigation expenses and to attain a higher degree of precision in defining a class, the court *may* consider affirmative defenses *apparent from the face of plaintiffs' complaint* at the class certification stage if--by the time of the certification decision--the defendants unambiguously indicate their intent to raise these particular affirmative defenses. See Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147 (1982); In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 38 (2d Cir. 2006); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 (3d Cir. 2001). Plaintiffs' belief that the court is *prohibited* from such consideration appears to be based on Plaintiffs' unduly narrow reading of the existing case law and, particularly, misreading of Smith v. Suprema Specialties, 2007 U.S. Dist. LEXIS 30001 (D.N.J. Apr. 23, 2007). See Plfs.' Mot. at 14-14; Plfs.' Reply at 5-9. Contrary to Plaintiffs' impression, neither plaintiffs nor defendants in Suprema argued that the court was *prohibited* from considering the merits of the case, including affirmative defenses. Rather, the Suprema defendants alleged that the typicality requirement under Rule 23 was not met because a part of the class was subject to an affirmative defense applicable only to that part of the class. See id. at 23. The Suprema court found the argument irrelevant to the issue of typicality noting that "[t]ypicality asks whether the . . . *plaintiffs' claims* [rather than *defendants' defenses*] are typical." Id. at 19 (quoting Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994). The sole statement made by the Suprema court pertinent to the quasi-Rule 59(e) issue raised by Plaintiffs was that, "[alt]hough a quick peek into the merits may be justified when class certification is entwined with the merits of the case, see Newton, 259 F.3d at 166, the [c]ourt [should] not *speculate* whether the members of the proposed class . . . might be unable to refute a *hypothetical* affirmative defense." Suprema Specialties, 2007 U.S. Dist. LEXIS 30001, at *25 (emphasis supplied). Since: (a) an affirmative defense evident from the plaintiffs' complaint cannot be qualified as "hypothetical," and (b) it takes the court no more than a "quick peek" to establish the presence of such defense without speculating, the Suprema decision refines rather than contradicts the existing general approach, i.e., that the court certifying a class may consider defendants' affirmative defense *if* they are based on admissions made in plaintiffs' complaint. Therefore, even if Plaintiffs brought a timely Rule 59(e) challenge to the Certified Class Definition, such motion for reconsideration would be denied since Judge Bassler did not make an error of law.

i.    <u>JUSTICIABILITY</u>

"'[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" <u>DaimlerChrysler Corp. v. Cuno</u>, 126 S. Ct. 1854, 1861 (2006) (quoting <u>Raines v. Byrd</u>, 521 U.S. 811, 818 (1997)).  Article III of the Constitution of the United States limits the scope of Federal Courts only to such matters.  <u>See</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992); <u>Danvers Motor Co. V. Ford Motor Co.</u>, 432 F.3d 286, 290-91 (3d Cir. 2005); <u>Lusardi v. Xerox Corp.</u>, 975 F.2d 964, 974 (3d Cir. 1992).  If a plaintiff does not present a case or controversy, <u>i.e.</u>, fails to show that (s)he has a personal stake in the ongoing litigation, a federal court would not have subject-matter jurisdiction over such a suit.[7]  <u>See</u> <u>United States Parole Comm'n. v. Geraghty</u>, 445 U.S. 388, 396-97 (1980) (holding that a case must be dismissed as moot when the parties lack a legally cognizable interest in the outcome); <u>see</u> <u>also</u> <u>Ballentine v. United States</u>, 486 F.3d 806, 810 (3d Cir. 2007) (same).  "This means that, throughout the litigation, the plaintiff *must have suffered*, or be threatened with, an *actual injury traceable to the defendant*." <u>Spencer v. Kemna</u>, 523 U.S. 1, 7 (1998) (emphasis supplied).  "Abstract injury is not enough.  [To claim justiciability,] the plaintiff must [assert a] direct injury . . . , not conjectural or hypothetical." <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 101-102 (1983) (internal citations and quotations omitted).  Therefore, if Plaintiffs' allegations did not include a proper assertion of actual injury traceable to the conduct of Defendants, Plaintiffs' class claim would be insufficient on its face and subject to dismissal for lack of

---

[7]    Exceptions exist for those class actions where the named representatives once had but, due to the chance of circumstances, lost their stake in the outcome, <u>e.g.</u>, prisoners-lead plaintiffs released during the period of litigation.  <u>See</u> <u>Gerstein v. Pugh</u>, 420 U.S. 103, 110 n. 11 (1975); <u>Sosna v. Iowa</u>, 419 U.S. 393, 402 n.11 (1975).  This exception is factually irrelevant to the issue at bar.

jurisdiction. <u>Accord</u> <u>FleetBoston</u>, 2005 U.S. Dist. LEXIS 36431, at *13 ("the class [has to be] defined so that it identifie[s] the persons . . . entitled to relief") (quoting Moore's Fed. P., <u>Manual for Complex Litig.</u> § 30.14, at 217-18 (3d Matthew Bender 1995)); Plfs.' Reply at 5 (quoting the same).

Plaintiffs appear to be keenly aware of this requirement, since Plaintiffs do not seek to eliminate all references to damages in the Certified Class Definition. Rather, Plaintiffs move this Court to alter the Certified Class Definition by (a) "tak[ing] as true the substantive allegations within the . . . [C]omplaint," and (b) including into Plaintiffs' class all those "who *sustained damages* as a result of" Defendants' alleged wrongdoing. Plfs.' Mot. at 9, 14 (emphasis supplied). However, applying the aforesaid two-prong principle to their claim, Plaintiffs simultaneously maintain that the Certified Class Definition containing the Cut-off Period is unsound because the Definition improperly "excludes a large number of [Summit shareholders] who had sold their FBF shares outside the [Cut-off] Period but who, nonetheless, . . . *sustain*[*ed*] . . . *damages*."[8] <u>Id.</u> at 4 (emphasis supplied). Read jointly, Plaintiffs' statement appears to allege that the Certified Class Definition has become unsound because it excludes a *justiciable* part of Plaintiffs' claim in spite of Plaintiffs' substantive allegations that certain Summit shareholders who obtained their FBF shares as a result of the FBF-Summit Merger sustained not-hypothetical damages (traceable to Defendants) outside the Cut-off Period. <u>See id.</u> at 4, 9, 14. Since Plaintiffs are designating the date of the FBF-Summit Merger as the first day when such Summit shareholders could have sustained damages, <u>see id.</u> at 19

---

[8]

Plaintiffs also challenge the soundness of the Certified Class Definition by asserting that, under the Section 11 requirements, Plaintiffs need not plead the loss causation aspect of their claims. <u>See</u> Plfs.' Mot. at 14-15 (citing <u>In re Merck & Co. Sec. Litig.</u>, 432 F.3d 261, 274 (3d Cir. 2005); <u>Moskowitz v. Lopp</u>, 128 F.R.D. 624, 632 (E.D. Pa. 1989)). However, the substantive elements composing Plaintiffs' pleading burden have no relation to the Rule 23(c)(1)(C) test of unsoundness.

("the proper start date of the class period is the first date when investors could have acquired their shares of stock pursuant to [the Merger] Registration Statement"), the Court will examine Plaintiffs' factual allegations in order to determine whether these allegations, if taken as true, state a justiciable claim rendering the Certified Class Definition unsound with respect to those shareholders who sold their FBF shares during the time span from the FBF-Summit Merger to the beginning of the Cut-off Period, .e., the shareholders that comprise the Beginning-Date Extension.

ii.     LOSS IN CASES ALLEGING MISREPRESENTATION

Although the old English common law of fraud rooted in Lord Mansfield's discussions of the Statute of Elizabeth, see Martin v. Pewtress, 98 Eng. Rep. 299 (K.B. 1769), Trueman v. Fenton, 98 Eng. Rep. 1232, 1234 (K.B. 1777), developed over the centuries into numerous and distinct forms of legal actions involving intentional, reckless or negligent types of misrepresentation, the key element of the original legal concept has invariably been retained, namely, the uniform understanding that a misrepresentation gives grounds to a legal action only when--and if--the *disclosure* of actual truth *damages* the victim of misrepresentation.  See id.; see also William Holdsworth, A History of English Law 67-70 (4th ed. 1936); accord Restatement (Second) of Torts §§ 546-49 (1976); Restatement (Second) of Contracts §§ 159-73 (1979).  In that sense, the law of securities follows suit; it differs from other areas of law concerned with misrepresentation only in one respect, i.e., it factors in the market realities underlying the Efficient Capital Market Hypothesis allowing the courts to link: (a) any misrepresentation made to the market with the resulting artificial price inflation ("Reliance Concept"), and (b) any disclosure (of the previously distorted truth) made to the market with the resulting damages suffered by those who invested in the securities affected

by the misrepresentation ("General Misrepresentation Concept").[9]  See Basic v. Levinson, 485 U.S.

224 (1988); In re Enron Corp. Secs., 2005 U.S. Dist. LEXIS 41240, at *16 (S.D. Tex. Dec. 22, 2005)

(clarifying that, in addition to formal disclosure by the issuer or an issuer's agent, the market may

learn of possible fraud [from] a number of sources: e.g., from whisteblowers, analysis questioning

financial results, . . . newspapers and journals, etc.") (quotation marks and citation omitted).

     In the case at bar, the issue is whether Defendants filed the Merger Registration Statement

falsely representing that FBF was properly reserved for its Argentine loss exposure in view of

Argentine adverse market conditions that existed at the time of the FBF-Summit Merger and were

colored by the allegedly foreseeable devaluation of the Peso.  See Apr. 23, 2004, Op. at 8.  Hence,

under the General Misrepresentation Concept, Plaintiffs' claims cannot qualify as a justiciable

controversy unless Plaintiffs allege that they were damaged by the market's: (a) discovery of the truth

about Defendants' alleged misrepresentation, and (b) *consequential* down-pricing of the FBF

shares.[10]

---

[9]

    Plaintiffs appear to be under the impression that judicial recognition of the market realities
is unique to the cases brought under the Securities Exchange Act of 1934 ("the '34 Act") because
the two key cases relied upon by Defendants, Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005) and
Semerenko v. Cendant Corp., 223 F.3d 165 (3d Cir. 2000), address Act '34 violations.  See Plfs.'
Mot. at 15-16; Plfs.' Reply at 6-8.  Plaintiffs err.  Apparently, Plaintiffs mistake the cause with effect
by asserting that the Supreme Court in Dura and the Court of Appeals in Semerenko intended to
*deduce* the general misrepresentation concept *from* the '34 Act scenarios.  See id.  The language of
both Dura *and* Semerenko decisions unambiguously indicate that both Courts *applied* the general
misrepresentation concept *to* the '34 Act scenarios in order to properly reflect the market realities
and avoid artificial exclusion of the '34 Act cases (or securities matters altogether) from all legal
actions based on misrepresentation.  See Dura, 544 U.S. at 339-46; Semerenko, 223 F.3d at 185.

[10]

    The Court is not entirely clear as to Plaintiffs' position on this seemingly obvious point since
Plaintiffs allege that (a) the investors "who sold their [FBF] shares [acquired through the FBF-
Summit Merger] outside the [Cut-off] Period were [per se] damaged by [Defendants']

### iii.   LOSS DURING THE BEGINNING-DATE EXTENSION

In their Complaint, Plaintiffs define their losses as follows:

At the time of the [FBF-Summit] Merger, FBF shares were trading at $41.00 per share. After [FBF] *revealed* the impaired nature of its Argentine loans . . . , the price of FBF . . . stock declined to . . . $23-24 per share. . . . Post-Merger [d]isclosures [made by FBF were the following:] On *December 20, 2001* . . . FBF . . . slashed [its] fourth quarter after[-]tax earnings by taking charge against the value of its investments on its books and increased loan loss reserves against loans that might not be repaid of 650 [m]illion . . . . [Then,] on *January 15, 2002*, FBF announced that it would delay reporting [its] fourth quarter 2001 earnings . . . . [The next disclosure took place] on *January 29, 2002*, [when] FBF announced that it took a charge of $538 million . . . related to Argentina. . . . [After that,] on *March 1, 2002*, FBF filed its Form 10-K [which] disclosed [that FBF] had lost $521 million doing business in Argentina [during 2001]. [Then,] on *July 15, 2002*, FBF announced that it would take a charge of $657 million . . . in addition to $251 million in [other] losses [and Plaintiffs' read this disclosure as related to the issue of Defendants' misrepresentations]. After the disclosure of the [above-listed] problems . . . , the price of FBF . . . stock declined to . . . $23-24 per share.

Compl. ¶¶ 8, 133-39 (emphasis supplied).

The foregoing unambiguously indicates Plaintiffs' contention that there was a total of five pertinent disclosures of the allegedly distorted truth, and these disclosures took place on December

---

misrepresentations in the Registration Statement because they suffered losses attributable to the unrecovered inflation in the purchase price" (hence, suggesting that the investors could have been injured by Defendants' alleged misrepresentation simply because they sold their FBF shares at a price lower than what the investors believed they should have received, while the purchasers of these sold shares, the same as the sellers and the remainder of the market, were unaware of the fact that there was *any* misrepresentation), Plfs.' Mot. at 16, but (b) simultaneously provide an example of the loss situation where "the alleged misrepresentations were [actually] disclosed to the public" prior to causing the loss  (hence, suggesting that a disclosure to the market is a necessary prerequisite to a valid claim based on misrepresentation). Id. Since Plaintiffs provide the Court with only this single example *directly linking* damages to disclosure and no authority in support of the proposition that an undisclosed misrepresentation can cause damages to the misrepresented, Plaintiffs' statement appears to be self-contradictory.  The Court, however, construes Plaintiffs' statement as a logically plausible claim, i.e., that the Summit shareholders who sold their FBF shares prior to the Cut-off Period suffered loss because the market down-pricing of FBF shares *ensued from* a pre-Cut-off-Period disclosure of Defendants' alleged misrepresentations.

20, 2001; January 15, 2002; January 29, 2002; March 1, 2002; and July 15, 2002. See id. Consequently, under the General Misrepresentation Concept, no investor could have been injured by the consequences of Defendants' alleged misrepresentation until December 20, 2001, the very first day when the market could have been awakened to the reality from its blissful ignorance.[11] See Basic, 485 U.S. at 247; Dura, 544 U.S. at 339-46; Semerenko, 223 F.3d at 185. Thus, had Judge Bassler been acting in accordance with Plaintiffs' request to "take as true the substantive allegations within the . . . [C]omplaint" and including into Plaintiffs' class all those "who sustained damages as a result of" Defendants' alleged wrongdoing, Plfs.' Mot. at 9, 14, Judge Bassler was obligated to conclude that allegations with respect to those Summit shareholders who sold their FBF shares prior to the December 20, 2001, could not amount to a justiciable claim due to the lack of an allegation that these shareholders suffered actual damages traceable to the alleged wrongdoing of the Defendants.[12] See Spencer, 523 U.S. at 7; Lyons, 461 U.S. at 101-102; Geraghty, 445 U.S. at

---

[11]

According to Defendants, the December 20, 2001 disclosure resulted from a Boston Globe article citing an FBF executive. See Defs.' Opp. at 11; accord Scott Bernard Nelson, FleetBoston to Cut 700 Jobs; Profit Melts Bank Blames Recessions at Home, in Argentina for Shortfall; Stock Gains, Boston Globe at E-1 (Dec. 20, 2001) (not specifying the date of FBF's statement to media).

[12]

Plaintiffs appear to conflate the concept of disclosure of a fact, and that of disclosure of the *magnitude* of the fact. See Plfs.' Mot. at 16 (suggesting that the market might have "partially" learned about Defendants' alleged misrepresentations prior to December 20, 2001). A partial disclosure is plausible only in a scenario involving *more than one* misrepresented fact (since the market can learn the truth about some facts but remain ignorant as to the others). Where the misrepresentation concerns *only one* fact--here, the alleged inadequacy of FBF's Argentine loan loss reserves at the time of the FBF-Summit Merger--the market either knows about this fact or it does not, since the reserves cannot be "somewhat" materially inadequate. Accord Buca Inc. Secs. Litig., 2006 U.S. Dist. LEXIS 75224, at *25-28 (D. Minn. Oct. 16, 2006) (refusing to entertain the concept of incremental disclosures of a fact); cf. United States v. Evans, 27 M.J. 34, 40 (C.M.A. 1988) (noting that a "yes-or-no" inquiry cannot be answered with "somewhat," since such an answer "is an oxymoron, like 'a little pregnant'"); see also EEOC v. Albertson's, Inc., 2006 U.S. Dist. LEXIS 72378, at *15 (D. Colo. Oct. 4, 2006) (drawing the same analogy with respect to a professional

396-97; <u>Ballentine</u>, 486 F.3d at 810; Moore's Fed. P., Manual for Complex Litig. § 30.14, at 217-18 ("the class [has to be] defined so that it identifie[s] the persons . . . entitled to relief"). Judge Bassler did exactly that: on December 22, 2005, he certified the class of Plaintiffs consisting of Summit shareholders that sold their FBF shares on or after December 21, 2001.[13] <u>See</u> <u>FleetBoston</u>, 2005 U.S. Dist. LEXIS 36431, at *13. The foregoing, of course, does not prevent the Certified Class Definition (even if sound as of December 22, 2005) from becoming unsound if and when the facts in this litigation: (a) have been more fully developed, and (b) now present a picture materially different from that existing on December 22, 2005.[14] Therefore, the Court turns to Plaintiffs' Motion in order to establish whether Plaintiffs' submission indicates that the facts currently known have rendered the Certified Class Definition unsound. <u>See</u> Fed. R. Civ. P. 23(c)(1)(C), Notes of Advisory Comm., Subdivision (c)(1) (1966).

---

relationship characterized as "less than full"); <u>Texas Medical Asso. v. Mathews</u>, 408 F. Supp. 303, 313 (W.D. Tex. 1976) (using the same terms with respect to an agency decision, which resulted from a "slight" legislative pressure); <u>In re Maynard</u>, 258 B.R. 91, 93 (Bankr. D. Vt.) ("The premise . . . that one might be partially dishonest . . . is like saying one is a little pregnant"), <u>rev'd on other grounds</u>, 269 B.R. 535 (D. Vt. 2001). Although the disclosure of the magnitude of the fact can be incremental (and, thus, cause a series of *additional* downward corrections of the stock price), the secondary question of the magnitude of damages qualitatively differs from and cannot be substituted for the threshold issue of whether and when defendant's liability has been so triggered to transform the events into a justiciable legal claim. <u>Accord</u> <u>Semerenko</u>, 223 F.3d at 185.

[13]

It appears that the parties' counsel indicated to Judge Bassler that the December 20, 2001, disclosure reached the market at or around close of business on December 20, 2001, hence allowing the first market reaction on the next day, December 21, 2001. <u>See</u> Docket Entry No. 78, at 64-67.

[14]

Defendants erroneously maintain that, in order to obtain an alteration of the class definition, Plaintiffs have to assert "new" facts, <u>i.e.</u>, facts qualitatively different from those stated in the Complaint. <u>See</u> Defs.' Opp. at 21. While the "new evidence" inquiry is a part of Rule 59(e) considerations, <u>see</u> Fed. R. Civ. P. 59(e), Rule 23(c)(1)(C) allows a motion to be made upon a "*fuller* development of the facts," even if the very *same* facts were already outlined by the time of original class certification. Notes of Advisory Comm., Subdivision (c)(1) (1966) (emphasis supplied).

Plaintiffs' Motion makes three statements (or interrelated groups of statements) that the Court might reasonably interpret as Plaintiffs' recital of fuller developed facts ("Developed Facts"): (1) interrelated statements comprising the chapter titled "Post-[FBF-]Summit Merger Disclosures," which lists three out of five disclosures stated in the Complaint, specifically, the ones made by FBF on January 29, 2002; March 1, 2002; and July 15, 2002 (hence, omitting the disclosures designated in the Complaint as December 20, 2001 disclosure, as well as that made on January 15, 2002), see Plfs.' Mot. at 6;(2) the statement specifying that FBF made its *first* disclosure on December *Nineteenth*, 2001 (rather than December 20th), see id.; and (3) the statement that "Plaintiffs *may* show that [Defendants'] alleged misrepresentations were . . . disclosed to [the market] *prior* to December 21, 2001," without specifying the actual date(s) of such hypothetical disclosure(s). Id. at 16 (emphasis supplied). Since Plaintiffs are seeking to move the beginning date of the class period from December 21, 2001 to the date of the FBF-Summit Merger on March 1, 2001 ("Disputed Period"), see id. at 5, 19, Plaintiffs' Developed Facts create two qualitatively different sub-periods within the Disputed Period that the Court should examine for the purposes of establishing whether a Rule 23(c)(1)(C) alteration is warranted. These sub-periods are: (1) from December 19, 2001, to December 21, 2001, inclusive ("Post-disclosure Sub-period"); and (2) from March 1, 2001 to December 18, 2001, inclusive ("Pre-disclosure Sub-period"). In view of: (a) Plaintiffs' Motion suggesting that the Developed Facts place the first FBF's disclosure at an unstated hour on December 19, 2001, rather than at close of business on December 20, see Plfs.' Mot. at 6, and (b) Defendants' Opposition being silent as to these discrepancies, see Defs.' Opp. at 24-30, this Court concludes that the Developed Facts indicate that the Certified Class Definition *might* have become unsound as to the Summit investors who sold their FBF shares during the Post-disclosure Sub-period.

By contrast, since Plaintiffs' statement that "Plaintiffs *may* show that [Defendants'] alleged misrepresentations were . . . disclosed to [the market] *prior* to December 21, 2001," Plfs.' Mot. at 16 (emphasis supplied), is: (a) set in terms of an "[a]bstract injury [which is] conjectural or hypothetical," and (b) is in direct contradiction with Plaintiffs' own statement that the *first* FBF's disclosure took place on December 19, 2001, see Plfs.' Mot. at 6, the Court has no reason to either assume that the Developed Facts place the first FBF's first disclosure on a date *preceding* December 19, 2001, or to presume that Plaintiffs, having the discovery process effectively completed after five years of litigation, unduly conceal from Defendants and this Court the fact of a pertinent FBF's disclosure preceding the one which allegedly took place on December 19, 2001. Consequently, the Court has no basis to conclude that the Developed Facts indicate that the Certified Class Definition became (or even could have become) unsound as to the Summit investors who sold their FBF shares during the Pre-disclosure Sub-period.[15]  See  Lyons, 461 U.S. at 101-102.

In sum, the Developed Facts (and the other statements made in the parties' submissions made thus far) appear to suggest that this first disclosure took place either in the early morning on December 19, 2001 or sometimes thereafter.  See Plfs.' Mot. at 6, Defs.' Opp. at 24-30.  However,

---

[15]

Moreover, the part of the Pre-disclosure Sub-period running from March 1, 2001 to September 19, 2001 is subject to the affirmative defense of statute of limitations, since: (a) Plaintiffs filed their Initial Complaint on September 19, 2002, (b) "[p]ursuant to Section 13 of the Securities Act, claims under Sections 11 and 12(a)(2) must be brought within one year after the discovery of the untrue statement or omission," Plfs.' Opp.  at 37, and (c) a hypothetical FBF's disclosure made between March 1, 2001 and September 19, 2001 would have put Plaintiffs on due notice more than a year prior to the filing of the Initial Complaint, hence rendering the entire action time barred. Since, in the event of Plaintiffs' hypothetical apprisal of Defendants about an FBF disclosure made between March 1, 2001 to September 19, 2001, Defendants would be entitled to dismissal of this entire action pursuant to Rule 12(c), this Court concludes that Plaintiffs were envisioning the Pre-disclosure Sub-period starting on *September 20*, 2001, rather than on *March 1*, 2001.

since neither Plaintiffs nor Defendants have provided the Court with data sufficient to meet the requirements of Rule 201(d) of the Federal Rules of Evidence, as defined in In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002), the Court is unable to take a judicial notice of the fact that FBF's first disclosure took place on a particular calendar date (or at a particular hour). Therefore, the Court: (a) amends the Certified Class Definition by substituting the qualifier "and sold such shares of FBF common stock [during the period which began after] December 21, 2001" with the qualifier "and sold such shares of FBF common stock during the period which began when the investing public could have reasonably learned about the content of FBF's disclosure that was made on or after December 19, 2001"; and (b) grants Plaintiffs' Rule 23(c)(1)(C) Motion to that extent.[16]

### 3. End-Date Extension

The part of Plaintiffs' Motion dedicated to the End-Date extension is qualitatively different from the part devoted to the Beginning-Date Extension in the sense that Plaintiffs acknowledge the following: (a) a proper definition of the class should encompass only those "investors [who] *sustained damages* as a result of Defendants violations of the Securities Act," Plfs.' Mot. at 20 (emphasis supplied); and (b) under Sections 11 and 12, Summit shareholders suffered *no damages* if they sold the FBF stock *after* the stock price rebounded up to the price that it had on the date of the FBF-Summit Merger. See id. at 15-16. Defendants agree with Plaintiffs on the legal aspect of

---

[16]

Although Defendants and Judge Bassler were in agreement that justiciable controversies are limited to the claims of those Summit shareholders who sold their FBF stock after the first pertinent disclosure about FBF's allegedly inadequate Argentine loan loss reserves, see FleetBoston, 2005 U.S. Dist. LEXIS 36431, at *13; Defs.' Opp. at 24-30, Plaintiffs' disagreement with--and challenges to-- the concept, see generally, Plfs.' Mot., Plfs.' Reply, prevents this Court from construing Plaintiffs' Rule 23(c)(1)(C) Motion with respect to the Beginning-Date Extension as a Rule 60(a) motion.

the issue.  See Defs.' Opp. at 12-13.  Moreover, it appears that Judge Bassler was in full agreement with the parties as to the correctness of this legal conclusion.  See FleetBoston, 2005 U.S. Dist. LEXIS 36431, at *13.  Plaintiffs, however: (a) challenge Judge Bassler's determination as to which particular date was actually the date when the FBF's stock price rebounded ("End-Date") up to the price that it had on the date of the FBF-Summit Merger, (b) allege that the End Date took place on December 16, 2003, and, thus (c) request substitution of the End-Date selected by Judge Bassler with a later date.  See Plfs.' Mot. at 4-5 (asserting that such End-Date Extension is warranted because "FBF's stock price . . . stayed below the Summit Merger price until December 16, 2003," hence implying that the End Date was December 16, 2003, rather than November 7, 2003, the End-Date selected by Judge Bassler); see also id. at 3 n.7 ("In fact, on November 7, 2003 [i.e., the end-date employed in the Certified Class Definition], FBF's share price opened at $40.93 and closed at $40.50.  Therefore, [on November 7, 2003] FBF's share price [did not rise] above the [FBF-]Summit Merger price [which was] $41.25").

Since it appears that the parties and Judge Bassler were in complete agreement as to the *legal approach* for selecting the End Date, and the only issue presented by the End-Date Extension part of Plaintiffs' Motion is whether November 7, 2003 was indeed the date when the FBF's stock price rebounded to the level it had on the date of the FBF-Summit Merger, this part of Plaintiffs' Motion is improperly characterized as a Rule 23(c)(1)(C) application.  Rather, this part of Plaintiffs' application presents a Rule 60(a) motion for correction of a clerical error (provided that there is one), see Fed. R. Civ. P. 60(a),  and will be construed by this Court accordingly.

To determine whether the Certification Opinion and Judge Bassler's accompanying Order contain a clerical error, this Court should establish at what post-FBF-Summit Merger date did FBF

stock rebound back to the price at which FBF stock was trading on the date of the Merger, which, in turn, requires the Court to be apprised as to the actual price at which FBF stock was trading on the date of the FBF-Summit Merger.

Plaintiffs' submissions contain two conflicting claims with respect to this issue, i.e., Plaintiffs' Motion suggests that the price paid for FBF shares on the date of the FBF-Summit Merger was $41.25, see Plfs.' Mot. at 3, n.7, while Plaintiffs' Complaint states the price as $41.00. See Compl. ¶ 8. Defendants agree with Plaintiffs' claim based on the $41.00 figure. See Defs.' Opp. At 12-13. In addition, Defendants' submission provides the Court with a copy of the Bloomberg Chart of Daily FBF Trading Prices ("Chart"), see Docket Entry No. 100-6 (Defs.' Opp., Landau Decl., Ex. C), indicating that on the date of the FBF-Summit Merger, the highest price paid for FBF shares was $41.25 per share, the lowest was $39.94 per share, while the adjusted closing price was $41.00 per share. See id. at 2. Thus, it appears that both Plaintiffs' initial reading--and Defendants' current reading--of FBF's per-share price of $41.00 at the date of the FBF-Summit Merger was/is based on the figure reflecting the adjusted *closing* price. See id. By contrast, Plaintiffs' current reading of FBF's per-share price of $41.25 is based on the *highest* price paid for FBF shares on the date of the FBF-Summit Merger. See id.

Moreover, the Chart reveals that FBF per-share price rebounded above $41.00 (a) on November 7, 2003, if the estimate is based on the *highest* price paid for FBF shares during that day (which was $41.02 per share), (b) on December 8, 2003, if the estimate is based on the adjusted *closing* price paid for FBF shares during that day (which was $41.05 per share); and (c) on December 17, 2003, if the estimate is based on the *lowest* price paid for FBF shares during that day (which was $41.65 per share). See Chart at 22. Since Plaintiffs assert that the Certified Class Definition should

Page 27 of 66

be altered to designate the End Date as December 16, 2003, see Plfs.' Mot. at 4-5, it appears that Plaintiffs' current contention compares the *highest* price paid for FBF shares at the date of the FBF-Summit Merger with the *lowest* price paid for the shares on December 17, 2003.  Since Defendants maintain that the End Date  should remain November 7, 2003, See Defs.' Opp.  at 12-13, it appears that Defendants' current contention compares the adjusted *closing* price paid for FBF shares at the date of the FBF-Summit Merger with the *highest* price paid for FBF shares on November 7, 2003. Clearly, each of these models present an apples-to-oranges comparison.

It is well established that "[t]he Court may take judicial notice of *closing* stock prices pursuant to Federal Rule of Evidence 201."[17]  SEC v. Bilzerian, 814 F. Supp. 116, 123 n.19 (D.D.C. 1993) (emphasis supplied), aff'd, 308 U.S. App. D.C. 43, 29 F.3d 689 (D.C. Cir. 1994); see also Rubke v. Capitol Bancorp Ltd., 460 F. Supp. 2d 1124, 1130 (N.D. Cal. 2006) (same); Freeland v. Iridium World Communs., Ltd., 233 F.R.D. 40, 44 (D.D.C. 2006); In re Alamosa Holdings, Inc. Sec. Litig., 382 F. Supp. 2d 832, 839 (N.D. Tex. 2005) (same); Ravens v. Iftikar, 174 F.R.D. 651, 661

---

[17]

Although nothing in the language of Federal Rule of Evidence 201 prevents a court from taking a judicial notice of a highest or lowest price, see, e.g., FMC Corp. v. Boesky, 727 F. Supp. 1182, 1196 n.17 (N.D. Ill. 1989) (discussing the court's power to take judicial notices of stock prices in general terms rather than in only terms of adjusted closing prices), courts usually limit judicial notice to adjusted closing prices of securities.  The rationale of this practice appears to be prudential rather than derived from the Rules of Evidence, since: (a) judicial notice of the price at which a certain security was traded on a certain date is typically required in cases where either the sale or purchase of security (or both) does not involve a face-to-face negotiation but was made on the basis of a presumption ensuing from the Efficient Market Hypothesis, and (b) such presumption could be reasonably based on the assumption that, had an average buyer (or seller) executed a transaction in certain security during a certain day, the buyer (or seller) would, most likely, execute it at the adjusted closing price for that security during that day.  The presumption, by definition, excludes a guarantee that the buyer (or seller) would have necessarily executed the transaction at the highest (or lowest) price paid for the security during that day; allegations based on the highest or lowest prices have to be based on the prices paid in *actual* transactions, accompanied by evidence that a transaction at the closing prices was bona fide unavailable (rather than available but rejected).

(N.D. Cal. 1997) (same); In re Delmarva Sec. Litig., 794 F. Supp. 1293, 1300 n.5 (D. Del. 1992) (same). However, at the instant juncture, neither Plaintiffs nor Defendants have filed a motion for judicial notice, pursuant to Federal Rule of Evidence 201(d), as to the issue of when did FBF post-FBF-Summit Merger stock price rebound to the price equal to or exceeding that paid for FBF shares on the date of the FBF-Summit Merger. See generally, Docket, see also Plfs.' Mot., Plfs.' Reply, Defs.' Opp. Being presented with no such motion and not being apprised of the parties' grounds for what appears to be apples-to-oranges comparisons, this Court finds it improper, at the instant juncture, to take a judicial notice as to the date of the End Date. See, e.g., Hardy v. Johns-Manville Sales Corp., 681 F.2d 334, 347 (5th Cir. 1982) (stating that the court may not take judicial notice of matters subject to dispute and clarifying that "judicial notice applies [only] to self-evident truths that no reasonable person could question, truisms that approach platitudes or banalities"). However, in view of a possibility that November 7, 2003 is *not* the End Date, this Court concludes that the Certified Class Definition *might* contain a clerical error.[18] Therefore, the Court grants Plaintiffs' Rule 60(a) motion insofar as to (1) define the End Date as "the date which was the first day following November 6, 2003, and during which the FBF shares traded at the price equal to--or higher

---

[18]

A typical judicial notice taken solely on the basis of the Chart with respect to the issues of (a) the price at which FBF shares were traded on March 1, 2003, i.e., the date of the FBF-Summit Merger, and (b) the date, which followed the FBF-Summit Merger and during which FBF shares rebounded back to the price they had on the date of the Merger, would be based on adjusted *closing* prices, which indicate that: (a) FBF stock was trading at $41.00 per share on the date of the FBF-Summit Merger, and (b) December 8, 2003 (rather than November 7 or December 16) was the date when FBF stock rebounded to the price equal to or exceeding the one existing on the date of the FBF-Summit Merger. See Chart at 22. Thus, a typical analysis would place the End Date on December 8, 2003. This observation, however, does not indicate this Court's opinion that either party is unable to produce evidence sufficient to meet Rule 201 requirements in order to establish that a date other than December 8, 2003 was actually the date when FBF stock rebounded to the price equal to or exceeding that which was paid for FBF shares on the date of the FBF-Summit Merger.

than--the price paid at the open market for FBF's shares on the date of the FBF-Summit Merger,"[19] and (2) alters the Certified Class Definition accordingly.

## III.  PREVIOUSLY UNADDRESSED PART OF DEFENDANTS' MOTION

### A.  PROCEDURAL RECAP

Plaintiffs filed the Initial Complaint on September 19, 2002.  See Docket Entry No. 1. Amending the Initial Complaint, Plaintiffs filed their current Complaint on April 22, 2003.  See Docket Entry No. 14.  Following Defendants filing of the Motion to Dismiss, Judge Bassler granted the Motion to Dismiss in part and denied in part.  See Docket Entries Nos. 28 and 29.  Consequently, Defendants filed their answer, and Judge Arleo entered the pretrial scheduling order setting the discovery deadline.  See Docket Entry No. 37.  Since the discovery process revealed the parties' difference of opinion as to which claims survived Defendants' Motion to Dismiss, Judge Arleo reserved the decision to Judge Bassler in the event Defendants filed a motion.[20]  See Docket Entries

---

[19]

In view of the difference between the highest, closing and lowest prices at which FBF shares were traded on the date of the FBF-Summit Merger,  compare Compl. ¶ 8 to Plfs.' Mot. at 3 n.7; see Chart, the Court--in order to prevent an inadvertent mistake--avoids using a particular dollar figure in the altered definition of the class and reserves taking judicial notice of the exact dollar figure until the time when--and if--the Court takes a judicial notice with respect to the actual calendar date of the End Date.

[20]

Counsel for the parties dedicated substantial parts of their briefs to discussions of a colloquia comment made by Judge Arleo during the September 20 Conference, which each counsel appears to interpret as Judge Arleo's substantive finding in favor of the cause advocated by that counsel (or, at least, as an indication that counsel's position is correct).  See generally, Defs.' Mot., Plfs.' Opp. If so, both counsel err, and this Court does not include any statements made during the September 20 Conference into its clarification of the April 23, 2004, Opinion provided herein. There is a "'well established' rule that 'courts speak through judgments and decrees, not oral statements . . . because 'until a judgment is signed the judge may change his mind and sign a different judgment'.'"  Atlantic Richfield Co. v. Monarch Leasing Co., 84 F.3d 204, 208 (6th Cir. Mich. 1996) (quoting Tiedman

Nos. 89, 103.  After Defendants filed their Motion pursuant to Federal Rule of Civil Procedure 12(c),

and Plaintiffs filed their Opposition (which included Plaintiffs' Application for leave to amend the

Complaint), Judge Wigenton denied Defendants' Motion with respect to Defendants' challenges as

to those Plaintiffs' claims that, pursuant to Judge Bassler's Order, survived Defendants' Motion to

Dismiss.  See Docket Entry No. 95.


    **B.**    **BACKGROUND**

The underlying events began to unfold on October 1, 1999, when Fleet Financial Group

merged with BankBoston Corporation ("BankBoston"), a then-holder of 139 Argentine bank

branches and the top fund manager in Argentina.  See Apr. 23, 2004, Op. at 2-3.  The merger

produced FleetBoston Financial Corporation ("FBF").  See id. at 3.  As the merger and acquisition

trend in the U.S. banking industry continued, FBF merged with Summit Bancorp in October 2000

("FBF-Summit Merger").  See id.  Under the terms of the merger agreement, Summit shareholders

received 1.02 shares of FBF for each share of Summit they owned in a fixed-stock exchange.  See

id.

---

v. Tiedman, 400 Mich. 571, 255 (Mich. 1977)); Berkovitz v. Home Box Office, 89 F.3d 24, 29 (1st
Cir. 1996) (quoting Advance Fin. Corp. v. Isla Rica Sales, Inc., 747 F.2d 21, 26 (1st Cir. 1984));
Rothschild & Co. v. Marshall, 51 F.2d 897, 899 (9th Cir. 1931) (same, quoting Kane & Keyser
Hardware Co. v. Cobb, 79 W. Va. 587 (1917)); Circle K Corp. v. United States, 1996 U.S. Claims
LEXIS 211, at *2 (Fed. Cl. 1996) (same).  Judge Arleo's order expressly reserved the ruling to Judge
Bassler.  See Docket Entry No.89.  Judge Bassler's perception could be gleaned from Judge Bassler's
Order that accompanied the April 23, 2004, Opinion (and, if further clarification is needed, from the
language of the Opinion itself).  In view of Judges Bassler and Arleo's orders, Judge Arleo's
comments are of little relevance to the inquiry at bar.  Cf. In re Application of Adan, 437 F.3d 381,
387(3d Cir. 2006) (only where the court's decree is reduced to a one-sentence order without any
formal written findings of fact, it might be proper to turn to the statements made by the court during
hearings or conferences).

In connection with that [second] merger, FBF and Summit jointly filed a Merger Proxy/Prospectus with the Securities and Exchange Commission ("SEC"), and FBF filed a Merger Registration Statement and Prospectus ("Merger Registration Statement") on January 25, 2001, which was later amended and supplemented on March 1, 2001, the actual closing date of the merger. FBF's Merger Registration Statement incorporated by reference a number of FBF's SEC filings [executed] prior to the date of the merger, such as its 1999 Form 10-K and its Form 10-Q reports for the first, second, and third quarters of 2000.

Id. at 3-4.

The mergers took place against the financial crises that spread through emergent markets of the late 20th Century and reached Argentina by the third quarter of 1998, pressuring the Argentine government to protect the shattering domestic economy by devaluating the national currency, the Peso, which had been pegged to the United States Dollar since 1992 in order to establish a stable exchange rate, control the inflation rate and ensure Argentine economic growth. See id. at 4. By the time of the FBF-Summit Merger, it was clear that Argentina was in deepening recession, FBF's Argentine assets were publically qualified as investments offering poor financial security, and the financial situation continued to worsen after the merger. See id. at 5-6. Fourteen months after the FBF-Summit Merger, Argentina underwent a period of economic and social turbulence, during which the Peso was un-pegged from the US dollar and devaluated dramatically, causing substantial losses to all holders of Argentine investments, including FBF. See id. at 6-7. Although FBF had loan loss reserves, the reserves proved to be insufficient to offset the total loss suffered by FBF as a result of Argentine recession and devaluation of the Peso.[21]

---

[21]

"[A] loan loss reserve . . . is [an] account set up by a bank based on its expectations about future loan losses. As losses occur, they are charged against this reserve. That is, the loan account is credited and the reserve account is debited." Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 (3d Cir.), cert. denied, 506 U.S. 934 (1992).

## C.    EVENTS PRECEDING DEFENDANTS' MOTION

> Plaintiffs' . . . Complaint [was] founded on the premise that . . . Defendants were
> required to increase the amount of its loan loss reserves for its Argentine loans and
> investment, yet failed to do so [and the] inadequacy of FBF's loan loss reserves
> [rendered] the Merger Registration Statement materially false and misleading.

Apr. 23, 2004, Op. at 14.

After Judge Bassler partially granted and partially denied the Motion to Dismiss, the parties

engaged in discovery proceedings as soon as Judge Arleo issued the Scheduling Order.  However,

it appears that the parties entered the discovery process having very different views as to which

claims Judge Bassler dismissed and which he allowed to proceed past the dismissal stage.  Therefore,

the parties engaged in discovery having entirely different views of the scopes of discovery.  Alas,

the incompatibility of their views did not become apparent until discovery commenced.  Defendants

state that they, apparently,

> believe[d that there was not reason for them to think] this action concerned any
> claims other that the Argentine Loan Loss Reserve Claims. [Defendants learned of
> Plaintiffs' view as to the scope of discovery only] days before the first deposition,
> [when P]laintiffs' counsel revealed their intention to examine witnesses on *any*
> subject in the Merger Registration Statement and, thereafter, proceeded to examine
> witnesses extensively on such unrelated [the Argentine Loan Loss Reserve Claims]
> topics as "integration problems" [allegedly experienced by FBF] after the Fleet and
> BankBoston merger, line items in FBF's financial statements (specifically, assets held
> for sale by accelerated disposition ("AHAD")), special purpose vehicles
> [("SPVs")],[22] including one SPV associated with Enron, and [unspecified]
> "operational controls" in FBF's Argentina branch.

Defs.' Mot. at 13-14.

---

[22]

The SPV is usually a subsidiary company with an asset/liability structure and legal status that
makes its obligations secure.  SPVs are created to fulfill narrow, specific or temporary objectives,
primarily to isolate financial risk, e.g., bankruptcy or a specific taxation or regulatory risk.  An SPV
may be owned by one or more entities.

Plaintiffs, however, believed such inquiries were entirely proper under their reading of Judge Bassler's Opinion. Plfs.' Opp. at 14-15. Being unable to reconcile their positions, the parties disputed the proper scope of discovery before Judge Arleo during the September 20 Conference. See Defs.' Mot. at 14-15, Plfs.' Opp. at 5-6. Apparently, the adversarial ardor of counsel, as well as the parties' mutual confusion, reached its peak at the September 20 Conference, see id., and resulted in: (a) ten days of parties' daily submissions of letters to Judge Arleo (addressing the issues discussed during the Conference), and (b) Judge Arleo notifying the parties that she will not accept any other informal submissions. See Docket Entry No. 68. Although the issue of the proper scope of discovery remained unresolved during the September 20 Conference, see Docket Entry No. 89 (stating that the issue would be resolved by Judge Bassler), *both* Plaintiffs and Defendants, simultaneously and inexplicably, developed the impression that Judge Arleo made statements during the Conference indicating that their view as to the scope of discovery was proper.[23]

---

[23]

It appears that the parties' impressions ensued from their understanding of a heated, perplexing and patchy colloquia that took place during the September 20 Conference. The confusion of--and run-away argument between--counsel during the Conference caused Judge Arleo to comment, "It's like Jean[e] Dixonville here, I mean . . . this isn't psychic stuff." See Docket Entry No. 81-3 (apparently referring to Jeane Dixon, an American astrologer and psychic of the 20th century). Defendants, reading this comment jointly with Judge Arleo's observation that Plaintiffs' perceptions as to what claims Judge Bassler allowed to proceed "constitute 'a complete shift in the case,'" Defs.' Mem. at 14-15, assert that Judge Arleo referred to Jeane Dixon to "express[] doubt about [Plaintiffs' Complaint properly stating claims other than the Argentine Loan Loss Reserve Claims, and she did so by] observing that [D]efendants should not have to be 'psychic,'" i.e., that Defendants need not guess what claims (other than the Argentine Loan Loss Reserve Claims) Plaintiffs might have been intending to assert but failed to articulate. Defs.' Mot. at 14-15. Plaintiffs, however, read Judge Arleo's reference to Jeane Dixon as an indication of Judge Arleo's opinion that Plaintiffs' claims (other than the Argentine Loan Loss Reserve Claims) were set forth in the Complaint so clear that "Defendants did not need to be psychic to see that." Plfs.' Opp. at 6.

Page 34 of 66

Moreover, regardless of Judge Arleo's strong encouragement to the parties to resolve the issue amongst themselves, see Docket Entry No. 68, at 2, they reached an impasse, and the Defendants' Motion followed.[24]

### D. THE PARTIES' CONTENTIONS AND THE DECISION REACHED UNDER RULE 12(C)

Defendants filed their motion under Federal Rule of Civil Procedure 12(c), alleging that, during the September 20 Conference, Judge Arleo made a comment that could be interpreted as: (a) an "invit[ation to] Defendants to move to dismiss the . . . Complaint with respect to [P]laintiffs' . . . claims" other than the Argentine Loan Loss Reserve ones, Defs.' Mem. at 15, and (b) a suggestion to move for dismissal under Rule 12(c). Therefore, Defendants: (a) characterized, collectively, all Plaintiffs' claims other than the Argentine Loan Loss Reserve ones as "putative claims," see id., and (b) requested the Court to examine the Complaint and dismiss the "putative claims" under the standard applicable to both Rule 12(b)(6) and Rule (c), i.e., for failure to state a claim in accordance with notice pleading requirement of Rule 8. See id. at 15-19 (citing Turbe v. Gov't of Virgin Islands,

---

[24]

The Court notes its concern with counsel's mutual personal insults included in the parties' briefs. The Court sees little reason for Defendants' counsel's comments that, "[because] Plaintiffs recognized that they have no evidentiary support for their wild accusations, . . . . Plaintiffs have pursued unpled claims." Defs.' Mot. at 3. The Court finds Plaintiffs' counsel comments even more disturbing, especially: (a) counsel's statements that Defendants' counsel "needed only to be literate" to discern every claim that Plaintiffs' counsel believe was made in the Complaint, Plfs.' Opp. at 6, and (b) the counsel's characterization of Defendants' counsel's legal decision (to make an argument asserting ambiguity of the Complaint) as "a display of incredible chutzpha." Id. at 26. This Court finds both counsels' decision to include such language in the parties' formal submissions particularly troubling in view of the counsels' apparently long history of mutual disrespect. See Docket Entry No. 68, at 2 (an order reflecting Judge Arleo's belief that she had to "remind counsel of [their] obligation to conduct [themselves] with the utmost civility and professionalism as officers of the District Court for the District of New Jersey"). This Court, therefore, gives counsel the Court's first and last notice that mutual courtesy and respect is expected and will be enforced.

**Page 35 of 66**

938 F.2d 427, 428 (3d Cir. 1991), the case recognizing that Rule 12(b)(6) and Rule 12(c) standards

of review are identical); see also Nationwide Mut. Ins. Co. v. Brown, 2007 U.S. App. LEXIS 6569,

at *4 (3d Cir. Mar. 21, 2007) (making the same observation).[25]  Distinguishing Plaintiffs' Argentine

Loan Loss Reserve Claims from Plaintiffs' "putative claims," Defendants asserted that

> [t]he core of [P]laintiffs' allegations is paragraph 48 [("Core Argentine Loan Loss
> Reserve Claim")] of the . . . Complaint, which states[,] in part:
>
>> [A]ccording to a former employee of FBF, who was employed at BankBoston
>> in Argentina (and stayed with . . . FBF) as an executive in risk management,
>> the break in convertibility (i.e., the [un-]pegging of Argentine Peso to the
>> U.S. Dollar) was foreseeable at the time of the merger between Fleet and
>> BankBoston[,] and it was discussed at the time that[,] when that happened[,]
>> there would be immediate and "severe" losses to the bank's Argentine
>> investments.  According to this former employee, during meetings, which
>> occurred during the due diligence before the Fleet/BankBoston merger and
>> were attended [by FBF's high executives] and others, presentation materials
>> described that convertibility would break and that it would lead to severe
>> losses.

Defs.' Mem. at 2.

Defendants, consequently, maintained that Plaintiffs' allegations, which were similar in

nature to the Core Argentine Loan Loss Reserve Claim, comprised Plaintiffs' entire Argentine Loan

Loss Reserve Claims, and such Argentine Loan Loss Reserve Claims were the only claims Judge

---

[25]   The Court notes, in passing, that both Plaintiffs and Defendants employ an improper
interpretation of Rule 8 notice pleading standard by invoking the overly lenient regime of "pure
notice" originated in Conley v. Gibson, 355 U.S. 41 (1957), a case decided half a century ago.  See
Defs.' Mot. at 15-16, Plfs.' Opp. at 16-17.  For the purposes of represented commercial cases, the
Supreme Court explicitly disavowed the oft-quoted statement in Conley of "'the accepted rule that
a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that
the plaintiff can prove no set of facts in support of his claim which would entitle him to
relief,'"stating that the "no set of facts" language "has earned retirement" and "is best forgotten."
Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1968-69 (2007).  However, this observation has
no bearing on the Court's analysis reflected in this Opinion, since--contrary to the parties' impression-
-none of the multiple issues at bar involves that of sufficiency of pleading under Rule 8.

Bassler allowed to proceed past the dismissal stage. <u>Id.</u> at 2-3. Defendants further asserted that, by contrast, the Complaint did not "sufficiently plead" any Plaintiffs' "putative claims" (explored by Plaintiffs during the discovery process), <u>id.</u> at 3, and such insufficiency of pleading caused Judge Bassler to find that the Complaint was exclusively devoted to the Argentine Loan Loss Reserve Claims, <u>id.</u> at 12-13 (citing to and quoting from the April 23, 2004, Opinion at 28, 32 and 34); <u>see also</u> Defs.' Reply at 6, and prevented Defendants from getting proper Rule 8 notice about Plaintiffs' "putative claims." Defs.' Mot. at 3, 13-14; Defs.' Reply at 6-8. Therefore, Defendants sought dismissal of Plaintiffs' "putative claims," pursuant to Rule 12(c), on two grounds: (1) these "putative claims" were pled "so inadequately, or [so] misleadingly framed, that they escape[d] the apprehension" of both Defendants and Judge Bassler. Defs.' Mot. at 17, and (2) these claims could no longer be added to the Complaint by Plaintiffs, since they have been time barred as of April 21, 2002. <u>See id.</u> at 16-18. Defendants asserted that Rule 12(c) was "the precise and proper vehicle" to challenge Plaintiffs' "putative claims" because their Rule 12(c) application was timely under Rule 12(h)(2), Defs.' Reply at 3-4, and because the Complaint was devoid of any facts or legal allegations that could be fairly read, under Rule 8, as "putative claims." <u>Id.</u> at 7-13.

Plaintiffs, however, were of the opinion that the Complaint included a multitude of claims, and Defendants erred in asserting that this action concerned, and the Complaint included, only Plaintiffs' "allegations 'related exclusively to FBF's *knowledge* at the time of the Merger Registration Statement that its loan loss reserves were inadequate because FBF allegedly knew that it would suffer as a result of the "upcoming" devaluation.'" Plfs.' Opp. at 1, 25 (quoting Defs.' Mot. at 8-9, emphasis supplied by Plaintiffs). Plaintiffs maintained that all Plaintiffs' claims which Defendants characterized as "putative" are not "putative" at all; rather they present a set of allegations that was

sufficiently pled in the Complaint.  See id. at 8-13.  Plaintiffs alleged that Judge Bassler not only: (a) "took a much broader . . . view of Plaintiffs' claims concerning FBF's Argentina loan loss reserve," but also (b) implicitly allowed all Plaintiffs' Disputed Claims[26] to proceed (even though he did not expressly address these Disputed Claims) "because Defendants themselves failed to raise them in their [Motion to Dismiss]."  See id. at 14-15.  Asserting that the Complaint "unequivocally alleged" the Disputed Claims," id. at 16, Plaintiffs maintained that Defendants' Motion had to be denied because these claims were already allowed to proceed by Judge Bassler, either expressly or implicitly ("Proceeded Claims").  Id. at 17-33.  In the alternative, Plaintiffs "request[ed] leave . . . to amend" the Complaint in order to include Plaintiffs' allegations as to the Disputed Claims.  Plfs.' Opp. at 18.

On March 5, 2007, Judge Wigenton issued the March 5 Order stating that, because the Complaint "has not been amended since [the issuance of Judge Bassler's Order, Defendants'] Motion amounts to an attempt to dismiss parts of the surviving portion of the [Complaint.  Since Judge Bassler already ruled on Defendants' Motion to Dismiss the] Court . . . will not reconsider its earlier decision."  March 5 Order at 2.

The March 5 Order did not address: (a) the issue of which claims were allowed by Judge Bassler to proceed past Defendants' Motion to Dismiss, or (b) Plaintiffs' Application.

---

[26]

Since the term "putative claims" offered by Defendants has a ruling-like connotation which might be improper at this point of litigation, and since Plaintiffs do not offer an alternative collective definition for the claims that Judge Bassler, allegedly, implicitly allowed to proceed without expressly addressing, this Court terms all Plaintiffs' claims, other than Plaintiffs' "allegations 'related exclusively to FBF's knowledge at the time of the Merger Registration Statement that its loan loss reserves were inadequate because FBF allegedly knew that it would suffer as a result of the "upcoming" devaluation,'" Plfs.' Opp. at 1 (quoting Defs.' Mot. at 8-9), as "Disputed Claims."

### E.    DISCUSSION

####     1.    Rule 12(c)

In their Motion, Defendants expressly invoke Rule 12(c), although Defendants' argument is based on a standard qualitatively different from the standard applicable to the Rule.[27]  See Defs.' Mot. at 16-19.  The Federal Rules permit an early challenge to the legal sufficiency of the allegations of a claim under both Rule 12(b)(6) and (c).[28]  When a defendant successfully challenges the plaintiff's legal entitlement to the relief demanded, even if all *well-pleaded facts* are taken in the light most favorable to the plaintiff, Rule 12(b)(6) permits a judgment as a matter of law in favor of the defendant.  As one court put it, "Like a battlefield surgeon sorting the hopeful from the hopeless, a motion to dismiss invokes a form of legal triage, a paring of viable claims from those doomed by law." Iacampo v. Hasbro, Inc., 929 F. Supp. 562, 567 (D.R.I. 1996).  If any legal requirement of the claim is not plead, the motion should be granted.  See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); see also  Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., 988 F.2d 1157, 1160 (Fed. Cir. 1993) ("The purpose of the rule is to allow the court to eliminate actions that are fatally flawed

---

[27]

In that respect, Defendants' error was analogous to that committed by Plaintiffs with respect to Plaintiffs' Rule 23(c)(1)(C) motion discussed supra, where Plaintiffs invoked one Rule of Federal Civil Procedure, i.e., Rule 23(c)(1)(C), but provided an argument relevant to the standard of another Rule, i.e., Rule 59(e).

[28]

Rule 12(c) provides that, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c); accord Defs.' Reply at 3.   The Rule is typically interpreted to mean an inquiry into "whether the plaintiff is pursuing a claim upon which relief can be granted," i.e., "a purely legal question that can be determined at virtually any stage of the federal process -- in the beginning, under Rule 12(b)(6); after the pleadings have been filed, under Rule 12(c); after discovery, under Rule 56; or after the plaintiff has presented his case at trial, under Rules 50(a) or 52." Teachers' Ret. Sys. v. Hunter, 477 F.3d 162, 170 (4th Cir. 2007).

in their legal premises and destined to fail, and thus spare litigants the burdens of unnecessary pretrial and trial activity"). For example, if a plaintiff seeks to recover on a tort theory but fails to allege that the defendant's actions were the cause of harm, a Rule 12(b)(6) motion would be appropriate.

Of greater importance as a true summary adjudication method, is the Rule 12(b)(6) motion which challenges the plaintiff's entitlement to relief upon the legal theory pleaded. For example, a plaintiff seeking recovery under a theory of negligent infliction of emotional distress under circumstances in which the governing law would not recognize the cause of action under the facts as pleaded may suffer judgment as a matter of law because recovery simply cannot be had as alleged. Rule 12(c) similarly permits an adjudication based purely on the allegations of the pleadings, the complaint and answer. Thus, this motion is particularly useful when the answer admits the allegations of the complaint, for example that a debt is owed as claimed, but raises an affirmative defense that is insufficient in law. See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 521-22 (1993) ("A defendant whose answer fails to contest critical averments in the complaint will, on motion, suffer a judgment on the pleadings that untruthful denials could have avoided [under] Rule 12(c)"). Both Rule 12 motions are "summary proceedings" on the merits in the sense they deal directly with the existence of a meritorious claim or defense. See Labaton and Sternberg, Using and Protecting Against Rule 12(b)(6) and Rule 9(b) Motions, 4 Practical Litigator 79 (1993); Hamabe, Functions of Rule 12(b)(6) in the Federal Rules of Civil Procedure: A Categorization Approach, 15 Campbell L. Rev. 119 (1993). That is why the Court of Appeals stated that, "[u]nder Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." Bayer Chems. Corp.

v. Albermarle Corp., 171 Fed. App. 392, 397 (3d Cir. 2006).

Therefore, Rule 12(c) could be invoked only with respect to those allegations that were "stated" but--as stated--did not amount to "a claim upon which relief can be granted."  See id.; see also Fed. R. Civ. P. 12(c).  By contrast,  neither Rule 12(c) nor, for as much as it matters, Rule 12(b)(6) is a proper vehicle to challenge a claim which is allegedly "not stated" at all, i.e., the claim, which is articulated so vaguely that a reader can neither discern the nature of the claim nor even be alerted to its existence, since it would be impossible to determine what facts such "unstated" claim involves.  See Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1969-74 (2007) (defining a properly stated claim as a "plain statement" with "enough heft," i.e., a set of "facts that are suggestive enough to render [plaintiff's allegations] plausible"); Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341 (2005).  Consequently, in the case at bar, Rule 12(c) could have been invoked only with respect to those Disputed Claims that were, in fact, "stated" in the Complaint.  See generally, Defs.' Mot., Plfs.' Opp; Defs.' Reply.  Conversely, the Court cannot utilize Rule 12(c) in order to establish which Disputed Claims were or which were not stated in the Complaint.  See Fed. R. Civ. P. 12(c).

### 2.      Rule 60(b)(6)

Rule 60(b) does not expressly grant standing to anyone; rather, it does not restrict any standing that party otherwise has.[29]  See Herring v. FDIC, 82 F.3d 282, 285 (9th Cir.), cert. denied, 519 U.S. 1027 (1996).  The Rule provides, in pertinent part, that "[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment [for]

---

[29]

Moreover, Subsection (6) has no specific time limitation.  See Fed. R. Civ. P. 60(b)(6); Stevens v. Stoumen, 32 F.R.D. 385, 387 (E.D. Pa. 1963).

any . . . reason justifying relief . . . ." Fed. R. Civ. P. 60(b)(6). Although "[a] motion under Rule 60(b) is addressed to the sound discretion of the trial court," Velez v. Vassallo, 203 F. Supp. 2d 312, 333 (S.D.N.Y. 2002) (citing Mendell on Behalf of Viacom, Inc. v. Gollust, 909 F.2d 724, 731 (2d Cir. 1990)); see also Helm v. Resolution Trust Corp., 84 F.3d 874, 877 (7th Cir. 1996), the rulings of a district court are not to be viewed "as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." Quaker Alloy Casting Co. v. Gulfco Industries, Inc., 123 F.R.D. 282, 288 (N.D.Ill. 1988). Conversely, the Rule provides "extraordinary judicial relief," which is granted "only upon a showing of exceptional circumstances." Camp v. Gregory, 67 F.3d 1286, 1290 (7th Cir. 1995), cert. denied, 517 U.S. 1244 (1996); Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986).

While the key purpose of Rule 60 is to allow the district court to relieve the parties from the mandate of a judgment previously rendered, see Fed. R. Civ. P. 60(b)(6), the Rule is also utilized to provide the parties with a clarification of the court's previously rendered decision. See Plaut v. Spendthrift Farm, 514 U.S. 211, 234-35 (1995) ("Rule 60(b) does not provide a new remedy at all, but is simply the recitation of pre-existing judicial power"); Abdur'Rahman v. Bell, 2007 Fed. App. 0264P, at *1 (6th Cir. 2007) ("[a] Rule 60(b) motion . . . neither seeks to add a new ground for relief, nor a federal court's previous resolution of a claim on the merits, but instead attacks some defect in the integrity of the federal proceedings"); Earth Island Inst. v. Ruthenbeck, 2007 U.S. App. LEXIS 13376, at *27 (9th Cir. June 8, 2007) (referring to "a Rule 60(b) motion [as an application] for *clarification* or amendment of the court's order") (emphasis supplied); United States v. Ortega, 218 Fed. Appx. 859, 860 (11th Cir. 2007) (same); United States v. Brown, 197 Fed. Appx. 248 (4th Cir. 2006) (same); Ripplin Shoals Land Co., LLC v. United States Army Corps. of Eng'rs, 440 F.3d 1038, 1043 (8th Cir. 2006) (same); Jackson v. City of Chicago, 149 Fed. Appx. 494, 496 (7th Cir. 2005)

(same); CNF Constructors v. Donohoe Constr. Co., 57 F.3d 395, 400-01 (4th Cir. 1995) (same); In re J.A.R. Barge Lines, L.P., 2007 U.S. Dist. LEXIS 20916, at *6 (W.D. Pa. Mar. 23, 2007) (expressly classifying "Motion for Reconsideration and/or Clarification under FRCP 60(b)" as an application brought under Subsection (6) of the Rule); see also Macondo's Profit Corp. v. Motorola Communications & Elecs., 863 F. Supp. 148 (S.D.N.Y. 1994) (employing Rule 60(b) to entertain a plaintiff's application to allow the plaintiff to introduce into evidence certain documents and testimony); Hughes v. Warehouse Emples. Local 169, 1985 U.S. Dist. LEXIS 14544 (E.D. Pa. Oct. 25, 1985) (entertaining plaintiffs' Rule 60(b) application requesting a determination as to whether to reinstate one of the dismissed defendants as a defendant in the action).

In the case at hand, the issue explored during the September 20 Conference, that is, which Plaintiffs' claims Judge Bassler discerned and allowed to proceed past Defendants' Motion to Dismiss, as well as Defendants' challenges against those Disputed Claims that *were not* among the Proceeded Claims (comprising, collectively, a quasi-Rule 60(b) application), could not have been examined by Judge Wigenton under Rule 12(c) invoked by Defendants since Rule 12(c) is--and actually was--used only to determine the validity of challenges against those claims which are actually "stated" in the pleadings.[30] See Fed. R. Civ. P. 12(c); March 5 Order at 2 ("[Defendants'] Motion amounts to an attempt to dismiss *parts of the surviving portion* of the [Complaint. Since

---

[30]

Rule 60(b) is applicable only to "final" judgments, orders or proceedings. See Fed. R. Civ. P. 60(b). In the case at bar, the parties: (a) disagree not only with respect to the issue of which claims were actually stated in the Complaint, but also (b) allege that, if the Disputed Claims were stated in the Complaint, Judge Bassler either implicitly dismissed or implicitly proceeded these Claims. See generally, Defs.' Mot., Plfs.' Opp., Defs.' Reply. Therefore, Judge Bassler's Order (accompanying his April 23, 2004, Opinion) is "final" for the purposes of Rule 60(b) analysis, since allegations of "implicit dismissal" of Plaintiffs' Disputed Claims supply the necessary degree of finality.

Judge Bassler already ruled on Defendants' Motion to Dismiss the] Court . . . will not reconsider its earlier decision") (emphasis supplied). Therefore, this Court construes the part of Defendants' Motion left unaddressed by Judge Wigenton's Order as an application for clarification of Judge Bassler's Opinion, pursuant to Rule 60(b)(6), and examines it accordingly.[31] Accord Nichelson v. United Dominion Realty Trust, 152 Fed. App. 421, 423 (5th Cir. 2005) (construing a plaintiff's request to complete outstanding discovery for the purpose of clarifying the nature of plaintiff's

---

31

Plaintiffs maintained that the quasi-Rule 60(b) aspect of Defendants' Motion should remain ignored by the Court until Defendants file a motion for summary judgement. See Plfs.' Opp. at 16 (asserting that clarifying the scope of Plaintiffs' claims, which Judge Bassler allowed to proceed past Defendants' Motion to Dismiss would be "wholly uneconomical and a waste of judicial resources" until Defendants move for a summary judgement). However, Rule 56(c) of Federal Civil Procedure governing motions for summary judgment is *not* a proper vehicle to determine which claims comprise the litigation at hand. See Fed. R. Civ. P. 56(c). A Rule 56(c) motion is appropriate only when, having the nature of claims established, a party requests a determination whether the evidence presented and reasonable inferences drawn from it indicate presence of a genuine issue of material fact. See id.; Petruzzi's IGA Supermarkets, Inc.v. Darling-Delaware Co., Inc. 998 F.2d 1224, 1230 (3d Cir.), cert. denied, 510 U.S. 994 (1993)). Moreover, a litigant having to guess the claims in the case is *effectively prevented* from making a Rule 56(c) motion, since the litigant would: (a) face an impossible task of asserting lack of genuine issue of material fact with respect to every possible claim, including the claims unclear or wholly unknown to the litigant, and (b) precluded from incorporating in his/her motion any challenges pursuant to Federal Rule of Evidence 401 (or from making separate in limine motions pursuant to Rule 401) in view of the apparent fact that one cannot state that a piece of evidence is irrelevant to a claim without knowing what the claim is. Compare Williams v. West Chester, 891 F.2d 458, 466 n. 12 (3d Cir. 1989) (making a Rule 401 relevance determination for the purposes of Rule 56(c) motion).

Since, in the case at bar, the issue of which claims comprise the instant litigation remains a source of the parties' confusion, it would be wholly uneconomical and a waste of this Court's resources (as well as those of the litigants) to leave the issue without a clarification, effectively inviting the still-confused parties to further delay this litigation through filing yet further motions. Cf. PSI Energy v. Exxon Coal USA, 1993 U.S. App. LEXIS 24664 (7th Cir. July 12, 1993), 17 F.3d 969 (Jan. 3, 1994), cert. denied, 512 U.S. 1222 (1994) (issuing first clarification three months after the original order, and--in view of the continuous confusion as to the scope of the issues involved in the litigation--following the first clarification with the second one, issued six months later); FTC v. Browning, 435 F.2d 96, 102 (D.C. App. 1970) (finding a clarification issued nine months after the issuance of the original order proper where the legal actions of the parties---which indicated confusion as to the scope of the litigation and discovery--threatened delays in the legal process).

claims, which were ambiguously stated in the plaintiff's complaint, as a Rule 60(b)(6) motion).

### 2. Plaintiffs' Claims That Survived Defendants' Motion to Dismiss

#### a. The Actual Language of Judge Bassler's Opinion

According to Judge Bassler, the Complaint

> allege[d] that[,] by the time of the issuance of the Merger Registration Statement, the deepening Argentine recession made it "foreseeable" that convertibility would have to be broken, thereby resulting in immediate and substantial losses on investments in Argentina. Indeed, Plaintiffs contend that . . . at the time of the merger between FBF and BankBoston, the break in convertibility was foreseeable and it was discussed that when convertibility was broken, there would be immediate and "severe" losses to FBF's Argentine investments. . . . As a result of this claimed foreseeable decoupling of the Peso from the dollar, and FBF's alleged knowledge of that foreseeable event as early as due diligence meetings leading up to FBF's merger with Bank Boston in 1999, Plaintiffs assert that the Merger Registration Statement was materially false and misleading for several reasons: (1) FBF failed to allocate the proper amount of loan loss reserves for Argentina and, as a result, FBF reported artificially inflated earnings and overstated its financial condition by "failing to timely record impairment to its loans and other investments in Argentina"; (2) FBF failed to adhere to Generally Accepted Accounting Principles ("GAAP"), which required greater levels of reserve for its loss exposure on FBF's Argentine loans; (3) FBF's internal risk assessment processes were inadequate under applicable banking regulations, particularly those of the Office of the Comptroller of the Currency ("OCC"), because FBF failed to properly classify certain loans and properly reserve for its loss exposure in Argentina; (4) the Merger Registration Statement failed to disclose the numerous alleged improper business practices at FBF's wholly-owned investment banking subsidiary ("Dismissed Claim").

Apr. 23, 2004, Op. at 8-9 (citing to and quoting from Compl. ¶¶ 4-7, 48, 64-65). Hence, Judge

Bassler concluded that

> Plaintiffs' . . . Complaint [was] founded on the premise that[,] as a result of the deepening recession in Argentina and the weakening of the Argentine Peso, Defendants were required to increase the amount of its loan loss reserves for its Argentine loans and investment, yet failed to do so in conformity with applicable GAAP. Given the alleged inadequacy of FBF's loan loss reserves, Plaintiffs contend that statements in the Merger Registration Statement were rendered materially false and misleading.

Id. at 14.

Fifteen pages of the April 23, 2004, Opinion are dedicated to the claims that Judge Bassler allowed to proceed past the Motion to Dismiss; the remainder of the Opinion is dedicated to: (a) outlining the factual background, (b) discussing applicable legal standards, and (c) assessing Plaintiffs' Dismissed Claim. See id. at 14-28. Out of these fifteen pages, only the first five pages elaborate on the nature of Plaintiffs' claims that were allowed to proceed to the next stage.[32] See id. at 14-19. Specifically, these five pages indicate Judge Bassler's understanding that

> Plaintiffs are not accusing Defendants of failing to see the future, but of refusing to recognize the impact of the adverse market information that was then available, as they were required to do, by disclosing those negative market trends in the Merger Registration Statement and reflecting them in FBF's loan loss reserves. . . . Plaintiffs allege [that] Defendants knowingly made material statements that FBF's loan loss reserves were adequate when in fact they were not, and the adverse market conditions were such that FBF should have disclosed those negative trends and increased its loan loss reserves based on the then-current economic conditions.

Id. at 16, 19.

Consequently, Judge Bassler allowed the above-described Plaintiffs' allegations to proceed, but dismissed Plaintiffs' other line of allegations, i.e., the Dismissed Claim. See Apr. 23, 2004, Op. at 36 ("For all the foregoing reasons, Defendants' [M]otion to [D]ismiss is denied in part and granted in part. Defendants' [M]otion to [D]ismiss is granted only with respect to the [Dismissed Claim] against [FBF's subsidiary]").

---

[32] The last three pages of this fifteen-page discussion address the issue of Defendants' alleged state of mind, see Apr. 23, 2004, Op. at 26-28, while the eight pages preceding the state-of-mind analysis are devoted to the question whether the validity of Plaintiffs' claims, which proceeded past the dismissal stage, could be negated by the workings of the Bespeak Caution Doctrine. See id. at 19-26.

### b.      *The Parties' Reading of Judge Bassler's Opinion*

Defendants: (a) read the April 23, 2004, Opinion as "den[ying] dismissal of the Argentine Loan Loss Reserve Claims," and (b) interpret the term "Argentine Loan Loss Reserve Claims" narrowly, i.e., as the allegation that Defendants knew that FBF's loan loss reserves were inadequate to sustain the anticipated economic impact of the de-pegging and fall of the Peso.  Defs.' Mot. at 11-12; Defs.' Reply at 5.

Plaintiffs, however, maintain that Defendants' reading of the April 23, 2004, Opinion is unduly narrow, and the case at bar concerned a broad panoply of claims other than those which Defendants define as the "Argentine Loan Loss Reserve Claims."  Plaintiffs, consequently, read the April 23, 2004, Opinion as allowing to proceed past Defendants' Motion to Dismiss, two broad categories of allegations, which Plaintiffs term as (1) "Argentine-related Claims" (this line of claims, apparently, includes the allegations termed by Defendants as the "Argentine Loan Loss Reserve Claims"), and (2) "Other Assets Claims."  See Plfs.' Opp. at 8-13.

The outer parameters of Plaintiffs' "Argentine-related Claims" are not entirely clear even from the face of Plaintiffs' Opposition, the document apparently dedicated to such clarification. While Plaintiffs define the "Argentine-related Claims" as a composition of three *seemingly independent* sub-groups of claims, namely, allegations that "(1) FBF understated its loan loss reserves for its Argentine loans, (2) FBF violated applicable accounting and regulatory rules and regulations, and (3) FBF misrepresented its expertise in Argentina, the severity of the risks that it faced in Argentina and its ability to manage the risks in Argentina," id. at 8, Plaintiffs nonetheless indicate a potential common nature of these three sub-groups of claims by summarizing all these claims as the "allegations concerning material misstatements of FBF's *loan loss reserves* due to

Page 47 of  66

Defendants' failure to properly incorporate all the risks existing at the time of the FBF-Summit Merger, not just the risk of breaking convertibility" of the Argentine Peso into the U.S. Dollar, id. at 19 (emphasis supplied), hence indicating that Plaintiffs' intended but unstated definition of the "Argentine-related Claims" should read as an allegation that "FBF understated its [Argentine] loan loss reserves [by] violat[ing] applicable accounting and regulatory rules and regulations [and] misrepresent[ing] its expertise in Argentina, the severity of the risks that it faced in Argentina and its ability to manage the risks in Argentina." Id. at 8-9.

In addition to asserting that Judge Bassler's Opinion *expressly* proceeded Plaintiffs' "Argentine-related Claims," see id. at 14, Plaintiffs also maintain that Judge Bassler *implicitly* proceeded another line of Plaintiffs' allegations, that is,  "Other Assets Claims" (consisting presumably, of allegations either wholly unrelated to FBF's Argentine operations or related to FBF's Argentine as well as non-Argentine activities and/or financials). See id. at 14-15. Plaintiffs' describe their line of the "Other Assets Claims" as follows:

> Other Assets Claims . . . relate to FBF's practices prior to the Summit Merger in 2000 and 2001 of . . . improperly reclassifying [FBF's non-performing loans] as AHADs and "other assets" [thus reducing the emphasis on the] negative connotations associated with nonperforming loans [and] violating well-established accounting and regulatory principles.

Id. at 10-11.[33]

---

[33]

The exact scope of Plaintiffs'  "Other Assets Claims" is unclear, since Plaintiffs' Opposition does not elaborate on any "Other Assets Claim" besides the AHAD-related one.  Apparently relying on the impressions obtained during the process of discovery, Defendants assert that Plaintiffs' "Other Assets Claims" also include allegations other than the AHAD-related ones.  See Defs.' Reply at 11 (Asserting that "[P]laintiffs . . . pursue [claims related to FBF's] SPVs, wire transfer[s] or ATM problems, or 'operation,' or 'integration' or other 'risks'").  Since Plaintiffs refer to the "Other Assets Claims" in plural (indicating that they envision a number of claims in addition to the AHAD-related one), the Court presumes that the reference to "Other Assets Claims" does, in fact, incorporate both

### c. *Claims Judge Bassler Allowed to Proceed*

Judge Bassler allowed to proceed no more and no less of Plaintiffs' claims than what the April 23, 2004, Opinion expressly indicated, and Judge Bassler's ruling will not be disturbed by this Court. Accord March 5 Order at 2.

Judge Bassler: (a) outlined the claims set forth in Plaintiffs' Complaint as claims alleging inadequacy of FBF's Argentine loan loss reserves (in addition to Judge Bassler's outline of Plaintiffs' Dismissed Claims), see Apr. 23, 2004, Op. at 7-9; (b) stated that Defendants "move[d] to dismiss Plaintiffs' Complaint," see id. at 2, without ever stating that Defendants had failed or omitted to challenge any Plaintiffs' allegations, see generally, Apr. 23, 2004, Op.; (c) substantively examined only two lines of Plaintiffs' allegations, one being that dedicated to FBF's Argentine loan loss reserves, while another being the Dismissed Claims, see id. at 14-35; and (d) entered no statement to the effect that he was, implicitly, proceeding any Plaintiffs' claims unrelated to FBF's Argentine

---

the AHAD-related claim and a panoply of other allegations unspecified in Plaintiffs' Opposition and related to various non-Argentine aspects of FBF's operations.

In addition to lack of clarity with respect to the scope of all Plaintiffs' "Other Assets Claims," Plaintiffs' Opposition does not include a clear outline as to the scope of Plaintiffs' AHADs-related claims. While Plaintiffs classify the AHADs-related claims as allegations distinct from Plaintiffs' "Argentine-related Claims," it appears that the AHADs are either: (a) the very same assets that Judge Bassler expressly related to FBF's Argentine loan loss reserves and classified as "[im]properly classif[ied] certain loans," Apr. 23, 2004, Op. at 9, or (b) at the very least, the group of assets encompassing the loans which alleged improper classification affected FBF's Argentine loan loss reserves, as well as other aspects of FBF's operations. In the former scenario, Plaintiffs' argument as to the AHADs-related claims is fully moot, since Judge Bassler proceeded Plaintiffs' claim about the allegedly improperly classified loans for the purpose of determining whether the Merger Registration Statement misrepresented sufficiency of FBF's Argentine loan loss reserves. In the latter scenario, Plaintiffs' argument is moot only partly, since the April 23, 2004, Opinion did not address the issue of improper loan classification outside the umbrella inquiry of FBF's Argentine loan loss reserves. Therefore, this Court reads Plaintiffs' AHADs-related claims as claims consisting *only* of allegations with respect to such FBF's classification of loans *other* than the classification, which allegedly affected FBF's Argentine loan loss reserves.

loan loss reserves. See id. at 36. Based upon all of the above, it is clear that the sole category of Plaintiffs' claims that was: (a) stated in Plaintiffs' Complaint in a discernable fashion, *and* (b) survived Defendants' Motion to Dismiss, consisted of the allegations that: (a) in view of the Argentine market conditions existing at the time of the FBF-Summit Merger, FBF's loan loss reserves were inadequate, and (b) Defendants made materially false and misleading statements to the contrary in the Merger Registration Statement. See id. at 14-19. Moreover, it appears that all Plaintiffs' claims (which Judge Bassler could discern from the face of the Complaint and did allow to proceed to the next stage) were colored by "Plaintiffs['] conten[tions] that . . . the break in [the Peso-Dollar] convertibility was foreseeable."[34] Id. at 8. However, it also appears that Judge Bassler read this category of Plaintiffs' claims broadly, since he concluded that

> Plaintiffs assert[ed] that the Merger Registration Statement was materially false and misleading for *several* reasons: (1) FBF failed to allocate the proper amount of loan loss reserves for Argentina and, as a result, FBF reported artificially inflated earnings and overstated its financial condition by "failing to timely record impairment to its loans and other investments in Argentina"; (2) FBF failed to adhere to [the] GAAP, which required greater levels of reserve for its loss exposure on FBF's Argentine loans; (3) FBF's internal risk assessment processes were inadequate under applicable banking regulations, particularly those of the . . . OCC, because FBF failed to properly classify certain loans and properly reserve for its loss exposure in Argentina.

Id. at 8-9 (emphasis supplied). Consequently, all Plaintiffs' claims with respect to FBF's alleged artificial inflation of earnings, non-compliance with the GAAP and OCC, insufficient internal risk assessment processes and improper classification of certain loans, etc., were allowed to proceed by Judge Bassler to the next stage for the purposes of establishing whether Defendants filed the Merger

---

[34]

Indeed, the "Factual Background" part of the April 23, 2004, Opinion is exclusively dedicated to discussion of the issue of convertibility and its effect on FBF's loan loss reserves. See Apr. 23, 2004, Op. at 3-7. By contrast, the Opinion contains no discussion as to any other problems with FBF's operations in general or FBF's loan loss reserves. See generally, id.

Registration Statement falsely stating that FBF was properly reserved for its Argentine loan loss exposure in view of Argentine adverse market conditions that existed at the time of the FBF-Summit Merger and were colored by--but not limited to--the alleged "foreseeab[ility of] decoupling of the Peso from the [D]ollar." Id. at 8. It follows that the scope of the Proceeded Claims was *broader* than that of Defendants' "Argentine Loan Loss Reserve Claims" (which appear to focus only on the foreseeability of decoupling of the Peso) but *narrower* than that of Plaintiffs' "Argentine-related Claims" (which appear to encompass every possible aspect of FBF's Argentine operations, including the aspects wholly divorced from the matters addressed by Judge Bassler, i.e., the adequacy of FBF's Argentine loan loss reserves, the alleged adversity of Argentine markets at the time of the FBF-Summit Merger, or from economic effects of the de-pegging of the Peso). Moreover, since the scope of Plaintiffs' "Argentine-related Claims" is already broader than the range of claims recognized and allowed to proceed by Judge Bassler, Plaintiffs' "Other Assets Claims," wholly unaddressed by Judge Bassler were, a fortuori, neither allowed by Judge Bassler to proceed to the next stage nor stated in a fashion that made these "Other Asset Claims" discernable to Judge Bassler or Defendants from the face of the Complaint.[35]

---

[35]

In view of the smorgasbord of perceptions with respect to the claims involved in this matter, this Court finds it useful to provide the following graph as a visual aid comparing these perceptions.



### 3.    Plaintiffs' Application for Leave to Amend

Since Judge Wigenton's Order was dedicated solely to Defendants' Rule 12(c) challenges to those Disputed Claims that were among the Proceeded Claims, Judge Wigenton had no reason to address Plaintiffs Application for "leave from the Court to amend" the Complaint to include all Plaintiffs' claims that fall outside the Proceeded Claims.  See March 5 Order, compare Plfs.' Opp. at 18.  By contrast, this Court's discussion of Defendants' Rule 60(b)(6) motion would be incomplete without examination of Plaintiffs' Application.

An application for leave to amend pleadings must be made under Rule 15.  See Fed. R. Civ. P. 15 ("Amended and Supplemental Pleadings").  The Rules of Federal Civil Procedure provide two distinct modes to seek an amendment, one under Rule 15(a) ("a party may amend the party's pleading . . . by leave of court or by written consent of the adverse party"),[36] and another under Rule 15(c)

---

The parties, however, are expressly notified that the entries made in the graph are *merely symbolic* in the sense that the parties should *not* interpret the size or adjoining positions of the entries as this Court's opinion that certain claims exceed one another in terms of their breadth of scope or significance, or that there is a certain legal interrelation between the claims lined in visual strings.

1 - Scope of Plaintiffs' Argentine Loan Loss Reserve Claims discerned by Defendants
2 - Scope of Plaintiffs' Argentine-related Claims
3 - Scope of Plaintiffs' Other Claims
4 - Scope of the Dismissed Claim addressed by Judge Bassler
5 - Scope of the Proceeded Claims addressed by Judge Bassler
6 - Scope of the Disputed Claims
7 - Scope of the Disputed Claims addressed by Judge Bassler and amenable to a Rule 12(c) challenge
8 - Scope of the Disputed Claims amenable to a Rule 60(b) inquiry, but not to a Rule 12(c) challenge

As the graph illustrates, Plaintiffs erred by asserting that Entry (5) was equal to the sum of Entries (2) and (3), while Defendants erred by alleging that Entry (5) was identical to Entry (1).

[36]

Under Rule 15(a), leave to amend a pleading "shall be freely given when justice so requires." See 3 James Wm. Moore, et al., Moore's Federal Practice ¶ 15.14 (3d ed. 2000).  Once an opposing party files a responsive pleading, leave to amend must be sought through the district court.  See Nerney v. Valente & Sons Repair Shop, 66 F.3d 25, 28 (2d Cir. 1995).  The district court, in its

(allowing "[a]n amendment of a pleading [that] relates back to the date of the original pleading ").[37]
See Fed. R. Civ. P. 15(a), (c).

### a.      *Plaintiffs' Application as a Rule 15(c) Motion*

In the case at bar, Plaintiffs do not specify whether they seek to amend the Complaint under
Rule 15(a) or 15(c).  See Plfs.' Opp.at 18.  However, it appears that the latter is the provision more
likely to be the one that Plaintiffs have in mind.  See Plfs.' Opp. at 37, 41-44 (alleging that the
Proposed Claims "relate back to the Initial Complaint").   In support of their assertion that the
Proposed Claims relate to those stated in the Initial Complaint, Plaintiffs offer the following
argument:

> Both the Argentine-related and the Other Assets [Proposed Claims] arose out of the
> same conduct, transactions and occurrences set forth in the Initial Complaint.  These
> claims . . . clearly relate back to the Initial Complaint. [The April 23, 2004, Opinion
> stated that] "Plaintiffs' [I]nitial Complaint centered around the alleged inadequacy of
> FBF's loan loss reserves in view of the Argentine economy and the violations of
> applicable accounting and banking regulations resulting therefrom."  See [Bassler]
> Opinion at 34.  The [Proposed Claims] concern FBF's inadequate loan loss reserves
> and violation of applicable accounting and banking regulations. . . .  The
> Argentine-related [part of the Proposed Claims] involve[s] FBF's misleading
> statements about its "expertise" in Argentina and FBF's inadequate internal controls,
> which resulted in  FBF's understatement of its loan loss reserves in Argentina.  The
> Initial Complaint alleged that FBF touted its vast operations and "expertise" in
> Argentina . . . and alleged that those statements were false and misleading. . . .  The
> Argentine-related [part of the Proposed Claims] clearly relate[s] back to the Initial
> Complaint.   The Other Assets [part of the Proposed Claims] also relate[s] back to
> the Initial Complaint because [it] concern[s] FBF's departure from generally accepted

---

discretion, should grant leave to amend (and may not deny leave to amend absent good cause). See
Foman v. Davis, 371 U.S. 178, 182 (1962).

[37]

The "relation back" doctrine of Rule 15(c) means that an amendment is permitted if the
amended "claim . . . arose out of the conduct, transaction, or occurrence set forth . . . in the original
pleading."  Fed. R. Civ. P. 15(c).

accounting principles and/or omissions of material fact in the [Merger] Registration Statement relating to regulatory and accounting issues involving FBF's troubled loans, including loans in Argentina.  More specifically, the Other Assets [part of the Proposed Claims is] relate[d] to FBF's inadequate loan loss reserves, including its loan loss reserves in Argentina, and involve, among other things, the improper reclassification of [non-performing loans] as other assets, such as AHADs.  The Other Assets [part of the Proposed Claims] center[s] on the fact that[,] prior to FBF's merger with Summit, Defendants caused transfers of [loans] that had been . . . classified as "non[-]performing" into AHADs which resulted in a misrepresentation of FBF's financial condition. FBF utilized AHADs to transfer [non-performing] Argentine [loans], in addition to other non-Argentine assets. . . .  Not only are the AHADs related to Argentina, but they are also related to FBF's loan loss reserves because by reclassifying these problem assets into the innocuous "other asset" account, FBF failed to disclose the true nature and extent of its loan problems. Thus, the Argentine-related and the Other Assets Claims [parts of the Proposed Claims] relate back to the Initial Complaint . . . .

Plfs.' Opp. at 41-44 (original brackets and citations omitted).

This argument suggests that Plaintiffs are not clear about the nature of their own Proposed Claims.  The Court, therefore, examines each part of Plaintiffs' above-quoted argument  seriatum.[38]

Plaintiffs do not dispute Judge Bassler's finding that "Plaintiffs' [I]nitial Complaint centered around the alleged inadequacy of FBF's loan loss reserves in view of the Argentine economy and the violations of applicable accounting and banking regulations resulting therefrom."  See Plfs.' Opp. at 42 (quoting Arp 23, 2004, Op. at 34) (emphasis supplied).  Plaintiffs, however, simultaneously: (a) maintain that the Proposed Claims relate to the Initial Complaint because the Proposed Claims "concern FBF's inadequate loan loss reserves and violation of applicable accounting and banking

---

[38]

The Court does not discuss Plaintiffs' statement that "[b]oth the Argentine-related and the Other Assets [parts of the Proposed Claims] arose out of the same conduct, transactions and occurrences set forth in the Initial Complaint.  These claims [therefore] clearly relate back to the Initial Complaint"as a simultaneously conclusory and circular argument, since this statement is the very proposition that Plaintiffs are aiming to prove, rather than an argument in support of such proposition.

regulations," id.; and (b) yet insist that the Proposed Claims present *claims different* from the Proceeded Claims (rather than *evidence* in support of the Proceeded Claims). These two contentions are incompatible. If the Proposed Claims address the issue of inadequacy of FBF's Argentine loan loss reserves, as manifested, inter alia, by FBF's violation of applicable regulations, the Proposed Claims are not claims but evidence of the Proceeded Claims, and the issue of amending the Complaint is moot, i.e., no amendment to the Complaint is required because--if this Court is to grant Plaintiff leave to amend--Plaintiffs would not fare any better than they already did with Judge Bassler proceeding the Proceeded Claims. Conversely, if Plaintiffs have in mind--but fail to articulate--Proposed Claims that address an issue *other* than that of inadequacy of FBF's Argentine loan loss reserves, as manifested, inter alia, by FBF's violation of applicable regulations, such Proposed Claims cannot relate back to the events and occurrences stated in the Complaint since, according to Judge Bassler, the Complaint "centered around the alleged inadequacy of FBF's loan loss reserves *in view* of the Argentine economy and the violations of applicable accounting and banking regulations *resulting therefrom*." Apr. 23, 2004, Op. at 34 (emphasis supplied).

This error in logic affects the remainder of Plaintiffs' argument. Indeed, Plaintiffs' next part of the argument suffers from the very same inconsistency. Specifically, Plaintiffs assert that, "[t]he Argentine-related [part of the Proposed Claims] involve[s] FBF's misleading statements about its 'expertise' in Argentina and FBF's inadequate internal controls, *which resulted in FBF's understatement of its loan loss reserves in Argentina*. The Initial Complaint alleged that FBF touted its vast operations and "expertise" in Argentina . . . and alleged that those statements were false and misleading." Plfs.' Opp. at 43 (emphasis supplied). If this Argentine-related part of the Proposed Claims seeks to assert that FBF's Argentine loan loss reserves were inadequate in view of Argentine

adverse market conditions existing at the time of the FBF-Summit merger, i.e., if the "touting" allegations relate to the issues of adequacy of FBF's Argentine loan loss reserves (or to a misrepresentation of such adequacy), this part of the Proposed Claims was already made part of the Proceeded Claims, hence rendering Plaintiffs' application for leave to amend moot. Conversely, if this Argentine-related part of the Proposed Claims challenges FBF's Argentine activities unrelated to loan loss reservation, such allegations cannot relate back to the Initial Complaint, which "centered around the alleged inadequacy of FBF's *loan loss reserves*." Apr. 23, 2004, Op. at 34 (emphasis supplied).

The last part of Plaintiffs' argument suffers from the same shortcoming. Plaintiffs maintain that "[t]he Other Assets [part of the Proposed Claims] also relate[s] back to the Initial Complaint because [it] concern[s] . . . FBF's inadequate loan loss reserves, including its loan loss reserves in Argentina, and involve, among other things, the improper reclassification of [non-performing loans] as other assets . . . . . . Not only [is this part of the Proposed Claims] related to Argentina, but [it is] also related to FBF's loan loss reserves." Plfs.' Opp. at 43-44. This statement appears to be a paraphrasing of Judge Bassler's finding that the Proceeded Claims involve FBF's alleged failure "to allocate the proper amount of loan loss reserves for Argentina [by, inter alia, failing to] adhere to [the regulations] which required greater levels of reserve for [the] loss exposure on FBF's Argentine loans [and by] fail[ing] to properly classify certain loans [to] properly reserve for its loss exposure in Argentina . . . ." Apr. 23, 2004, Op. at 8-9. If so, Plaintiffs' application for leave to amend to include the Other Assets part of the Proposed Claims is moot. Alternatively, if Plaintiffs' use of the phrase "in addition to other non-Argentine assets" indicates that the Other Assets part of the Proposed Claims asserts claims unrelated to FBF's Argentine loan loss reserves, this part of the Proposed

Claims cannot relate to the Initial Complaint, which centered around the alleged inadequacy of FBF's *Argentine* loan loss reserves. See Apr. 23, 2004, Op. at 34.

Therefore, if the Court is to construe Plaintiffs' application for leave to amend as a Rule 15(c) motion, Plaintiffs' motion is either moot, in its entirety, or fails to satisfy the "relation back" requirement. In view of the foregoing, the Court gives Plaintiffs' application for leave to amend the benefit of the doubt, construes it as a Rule 15(a) motion seeking to add claims unrelated to those stated in the Complaint, and examines the Proposed Claims accordingly.

### b. *Plaintiffs' Application as a Rule 15(a) Motion*

Ordinarily, the plaintiff may be granted "leave [to amend] when justice so requires." See Foman, 371 U.S. at 182; Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993). Indeed, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Foman, 371 U.S. at 182-83. However, while "Rule 15(a) gives the court extensive discretion to decide whether to grant leave to amend after the time for amendment as of course has passed," Alan Wright et al., Federal Practice and Procedure: Civil 2d § 1486 (2d ed. 1990), the Rule 15(a) "generous standard is tempered by the necessary power of a district court to manage a case" in light of the factors listed in Foman. See Shivangi v. Dean Witter Reynolds, Inc., 825 F.2d 885, 891 (5th Cir. 1987). The Supreme Court has identified several factors to be considered when applying Rule 15(a):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, *futility of amendment*, etc.--the leave sought should, as the rules require, be "freely given."

Foman, 371 U.S. at 182 (emphasis supplied); see also Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc., 663 F.2d 419, 425 (3d Cir. 1981), cert. denied, 455 U.S. 1018 (1982).

It follows that the courts need not entertain futile amendments to the pleadings, e.g., amendments that aim to assert claims subject to an affirmative defense incorporated either in the proposed claim or in the claims already submitted.  See Jamison v. McCurrie, 388 F. Supp. 990 (N.D. Ill. 1975) (denying an application to amend seeking to add a claim subject to an affirmative defense); Dixon v. Pennsylvania Crime Com., 67 F.R.D. 425 (M.D. Pa. 1975) (same); accord Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001)("[A claim] may be subject to dismissal . . . when an affirmative defense . . . appears on its face") (quoting ALA, Inc. v. CCAir, Inc., 29 F.3d 855, 859 (3d Cir. 1994), and citing Alan Wright et al., Federal Practice and Procedure § 1357, at 358-59 (1990)).  A typical example of such futile attempt to amend is that to add an untimely claim.  See, e.g., United States v. St. Luke's Hosp., Inc., 441 F.3d 552 (8th Cir. 2006) (affirming denial of amendment seeking to add time barred claims); Adorno v. Crowley Towing & Transp. Co., 443 F.3d 122 (1st Cir. 2006) (same); Doe v. Howe Military Sch., 227 F.3d 981 (7th Cir. 2000)(same); Brewer-Giorgio v. Producers Video, Inc., 216 F.3d 1281 (11th Cir. 2000) (same); Sutton v. New Century Fin. Servs., 2005 U.S. Dist. LEXIS 36392 (D.N.J. Dec. 27, 2005).

In the case at bar, it appears that the Proposed Claims are both time barred and legally insufficient due to lack of loss causation.  Pointing at the untimeliness of Plaintiffs' Proposed Claims, Defendants assert that the Proposed Claims are

Page 58 of 66

time-barred, [since] the Merger Registration Statement was filed on January 25, 2001, and was supplemented and amended on March 1, 2001. [Therefore, the Proposed Claims] became time-barred on March 1, 2002, prior even to the [I]nitial [C]omplaint being filed on September 19, 2002.

Defs.' Mot. at 26 (relying on the applicable one-year limitations period under 15 U.S.C. § 77m).

Plaintiffs, however, maintain that the Proposed Claims cannot be deemed time barred since (a) Defendants implicitly waived their affirmative statute of limitations defense by not challenging the Proposed Claims on the grounds of timeliness sooner than in Defendants' instant Motion; and (b) Plaintiffs obtained notice of the Proposed Claims on July 15, 2002 and, therefore, Plaintiffs' instant application for leave to amend is timely. See Plfs.' Opp. at 33-44.

Plaintiffs' contentions are flawed. First, it would be indeed anomalous for Defendants to challenge timeliness of the Proposed Claims before Defendants even became aware of the existence of such claims. Since: (a) Defendants raised the challenge immediately upon discovering Plaintiffs' interest in exploring the Proposed Claims, see September 20 Conference at 48, and (b) Judge Arleo expressly directed Defendants to wait until conclusion of the discovery proceedings to bring a timeliness challenge, see id. at 47-50, this Court finds that Defendants neither could nor did implicitly waive their affirmative defense based on the statute of limitations.[39]

---

[39]

The Court notes its concern with Plaintiffs' contention that an adversarial (or judicial) "silence" with respect to a particular topic is a sign that either the Court or Defendants' accepted or conceded exactly the very legal point that Plaintiffs wish to establish, regardless of all indications that neither the Court nor Defendants were aware of (and thus, had an opportunity to address or deny) Plaintiffs' points. As a general rule, when a contention is made in the defendant's (or, for that matter, in a judge's) presence, the defendant's failure to challenge such contention (or judicial silence as to such contention) could be interpreted as the defendant's waiver of challenge (or as judicial concession) with respect to the contention only if the circumstances clearly indicate that the defendant (or the judge) is so notified about the contention and its nature that (s)he has a meaningful opportunity to address it. See, e.g., Restatement (Second) of Torts § 892, cmts. b, d.

With respect to their second point, i.e., that Plaintiffs obtained notice of the alleged wrongdoing underlying the Proposed Claims on July 15, 2002 (and, therefore, Plaintiffs' instant application for leave to amend is timely), Plaintiffs argue as follows:

> Pursuant to Section 13 of the Securities Act, claims under Sections 11 and 12(a)(2) must be brought within one year after the discovery of the untrue statement or omission, or after discovery should have been made by the exercise of reasonable diligence. Under the "inquiry notice" standard, the one-year period begins to run when the plaintiffs discovered or in the exercise of reasonable diligence should have discovered the basis for their claim against the defendant. . . . Plaintiffs were not on inquiry notice of Defendants' wrongdoing on March 1, 2001. . . . The [Proposed] Claims are based upon an analysis of Defendants' inappropriate . . . reclassifications of [non-performing loans]. Plaintiffs . . . became aware of [such reclassification] after . . . FBF's disclosures concerning problems with its loan portfolio. First, on December 19, 2001 it was announced that FBF took a $650 million charge against the value of its investments in Argentina and increased its loan loss reserves [i.e.,] it was disclosed that FBF would record charges related to [reclassifications of non-performing loans]. . . . However, [for the reasons not stated by Plaintiffs,] this disclosure was not sufficient to trigger [Plaintiffs'] inquiry notice [with respect to] the [Proposed] Claims. [Moreover, according to Plaintiffs, the inquiry notice was, somehow, also not triggered] on January 29, 2002 [when] FBF issued a press release, disclosing among other things, a charge [which] related to . . . non[-]performing [loans. Plaintiffs maintain that the inquiry notice was actually triggered only] on July 15, 2002 [i.e., the date when] FBF announced that it would take an additional charge of $675 million related to non-performing [loans. Plaintiffs maintain that] a reasonable investor could not have been put on inquiry notice until July 15, 2002 as to the extent of FBF's previously undisclosed problems in Argentina . . . . [Plaintiffs assert that] the fact that FBF took [two] charges relating to . . . reclassifi[cation of non-performing loans on December 19, 2001 or on January 29, 2002], was in and of itself not indicative of a misrepresentation regarding [FBF's] non[-]performing loans. [Plaintiffs maintain that only the July 15, 2002 disclosure of the charge taken by FBF with regard to non-performing loans sufficiently put Plaintiffs on] inquiry notice [and, therefore,] Plaintiffs had until July 2003, at the earliest, to file their claims involving the [Proposed] Claims. [Since] Plaintiffs filed the [instant Complaint] on April 23, 2003, less than one year after [the] July 15, 2002 [disclosure, Plaintiffs allege that their Proposed] Claims are not time barred.

Plfs.' Opp. at 37-41 (quotation marks and citations omitted).

The above-quoted Plaintiffs' argument is faulty for two reasons. First, Plaintiffs' argument that *neither* FBF's $650 million charge taken on December 19, 2001 in connection with FBF's non-

Page 60 of 66

performing loans *nor* the January 29, 2002 charge (in the amount of $538 million, <u>see</u> Compl. ¶ 135) taken in connection with the same issue put Plaintiffs on inquiry notice, but somehow the $675 million charge taken on July 15, 2002 *did* put Plaintiffs on such notice, lacks logic. The sole distinction drawn by Plaintiffs between the first two charges (totaling together $1.186 billion) and the third charge of $675 million is "the *extent* of of FBF's previously undisclosed problems in Argentina." Plfs.' Opp. at 40 (emphasis supplied). However, the Proposed Claims do not involve the *magnitude* of "FBF's [allegedly] undisclosed problems in Argentina"; rather the Proposed Claims unequivocally allege that the Merger Registration Statement misrepresented FBF's financial position through improper classification of non-performing loans, no matter how large or small these allegedly improperly classified loans were. <u>See</u> Plfs.' Opp. at 26-33. If so, a misrepresentation in the amount of $1.186 billion should have been just as significant to Plaintiffs as that totaling $1.861 billion. Indeed, it would be anomalous to presume that a reasonable person would be completely ignorant of a potential problem after learning about a $1.186 billion charge but would, somehow, be able to recognize that there is a problem after another $675 million charge is added. <u>See</u> <u>In re</u> <u>NAHC, Inc. Sec. Litig.</u>, 306 F.3d 1314, 1325-26 (3d Cir. 2002) ("The test . . . is an objective one, based on whether a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a [sign of potential problem]. Plaintiffs need not know all of the details or narrow aspects of the alleged [problem] to trigger the limitations period; instead, the period begins to run from the time at which plaintiff should have discovered the general [indication of the problem]").

Second, even if the Court is to assume, hypothetically, that Plaintiffs were put on inquiry notice only on July 15, 2002, and the Proposed Claims, thus, became time barred only on July 15,

2003, the Proposed Claims were woefully untimely as of January 31, 2006, i.e., the date when

Plaintiffs requested leave to amend the Complaint in order to include their Proposed Claims.[40]

Furthermore, even if Plaintiffs' Proposed Claims were not time barred, the Proposed Claims

appear to be completely unrelated to the losses allegedly incurred by Plaintiffs and, therefore,

inclusion of the Proposed Claims into the Complaint would be futile. Specifically, the Complaint

---

[40]

Plaintiffs try to justify their more than two and a half year delay (from July 15, 2003 to January 31, 2006) in requesting leave to amend by asserting that the Proposed Claims are timely under the "relation back" doctrine. However, Plaintiffs cannot utilize the "relation back" doctrine derived from Rule 15(c) to avoid the equitable considerations of Rule 15(a). The Court of Appeals unambiguously indicated that a Rule 15(a) equitable analysis does *not* involve any "relation back" considerations. See Arthur v. Maersk, Inc., 434 F.3d 196, 203 (3d Cir. 2006) (clarifying that the "relation back" doctrine is a consideration under Rule 15(c) but not under Rule 15(a)). Moreover, even if the "relation back" doctrine were a part of Rule 15(a) analysis, it would not remedy the shortcomings of Plaintiffs' position, since the Court has already established that Plaintiffs' Proposed Claims *do not* relate to the Proceeded Claims. (Plaintiffs do not assert that the Proposed Claims related to their Dismissed Claim, which, itself, was dismissed as untimely for failure to meet the "relation back" requirement. See generally, Plfs.' Opp.)

Equitable analysis of Rule 15(a) based on the Supreme Court's guidance in Foman, 371 U.S. at 182, strongly argues against granting Plaintiffs leave to amend. Even if this Court is to presume that, after reading: (a) Defendants' Motion to Dismiss, which was silent as to the Proposed Claims; (b) the April 23, 2004, Opinion, which was equally silent as to the Proposed Claims, and (c) Defendants' Answer, which was still silent as to the Proposed Claims, Plaintiffs, somehow, retained a good faith belief that the Proposed Claims were pled in the Complaint, Plaintiffs, unquestionably, had proper notice that the Proposed Claims were unpled (or, at the very least, could have been deemed unpled) when Judge Arleo dedicated an entire Conference to this very issue. However, Plaintiffs neither made an application for leave to amend the Complaint at that Conference (which took place on September 20, 2005), see generally, September 20 Conf., Tr., nor filed a speedy Rule 15 motion to add the Proposed Claims. See generally, Docket. Rather, Plaintiffs elected to wait for more than fourteen months, until January 31, 2006, so they could insert ten words "Plaintiffs request leave from the Court to amend the [Complaint]" into Plaintiffs' forty-five page Opposition. The Court sees no equitable grounds for excusing Plaintiffs' more than two and a half year delay. See Morongo Band of Mission Indians v. Rose, 893 F.2d 1074 (9th Cir. 1990) (affirming denial of leave to amend where motion to amend was filed nearly 2 years after original complaint, and new claims set forth in amended complaint would have greatly altered nature of litigation and would have required defendants, at a late point in proceedings, to have undertaken entirely new course of defense and stating that, "[i]n light of the radical shift in direction posed by [new] claims, their tenuous nature, and the inordinate delay, [it is proper to] deny[] leave to amend").

asserts that

> The Merger Registration Statement was materially false and misleading [because (1)] FBF [failed] to increase the amount of its [loan] loss reserves [and] overstate[d] . . . . numerous financial ratios [reflecting FBF's earnings; (2)] FBF fail[ed] to properly reserve for its [loan] loss exposure in . . . violat[ion of] GAAP[; (3)] FBF represented that it . . . adjusted its [loan] loss reserves according[ to proper risk assessment procedures . . . . As a result of [the above-listed three types of] material misrepresentations and omissions . . . , [Plaintiffs] received overvalued FBF shares and [were injured when FBF-Summit] revealed the impaired nature of its Argentine loans [and] the price of FBF common stock declined . . . .

Compl. ¶¶ 4-6, 8.

The foregoing states, in no uncertain terms, that Plaintiffs' losses were caused by FBF's alleged misstatement with respect to its Argentine loan loss reserves; and the Court takes judicial notice of this fact. See Jackson v. Broad. Music, Inc., 2006 U.S. Dist. LEXIS 3960, at *18 (S.D.N.Y. Jan. 31, 2006) ("the court may take judicial notice of [factual] admissions in pleadings and other documents in the public record filed by a party . . . that contradict the party's [subsequent] factual assertions") (quotation marks and citations omitted), compare Young v. Dreiblatt, 2000 U.S. App. LEXIS 21704, at *2 (9th Cir. Aug. 17, 2000) (amended complaint supersedes previous complaint in the sense that it constitutes waiver of *legal claims* made in the previous complaint). Therefore, granting Plaintiff leave to amend in order to include the Proposed Claims would be futile,[41] since the wrongdoings alleged as the basis of the Proposed Claims caused Plaintiffs no

---

[41]

Alternatively, if Plaintiffs' Proposed Claims asserting improper reclassification of non-performing loans are, somehow, part of Plaintiffs' claims alleging insufficiency of FBF's Argentine loan loss reserves, Plaintiffs' application is moot since this issue would be part of the Proceeded Claims already recognized as part of the Complaint by Judge Bassler. See generally, Apr. 23, 2004, Op.

injury.[42] Accord Gutierrez v. Peters, 111 F.3d 1364, 1374 (7th Cir. 1997) ("[A] plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts. . . . Allegations in a complaint are binding admissions . . . and admissions can of course admit the admitter to the exit from the federal courthouse") (quoting Jackson v. Marion County, 66 F.3d 151, 153 (7th Cir. 1995)).

Therefore, the Court concludes that granting Plaintiffs leave to amend would be futile and not in the interests of justice. See, e.g., Pabst Brewing Co. v. Corrao, 176 F.R.D. 552, 557 (E.D. Wis. 1997), aff'd 161 F.3d 434 (7th Cir. 1998) ("In determining whether to allow amendment, it is proper for court to consider judicial economy and most expeditious way to dispose of merits of

---

[42]

The Court takes due notice of Plaintiffs' allegation that the Complaint "provides sufficient information" that Plaintiffs' losses ensued also from Defendants' alleged wrongdoings unrelated to FBF's Argentine loan loss reserves. See Plfs.' Opp. at 32-33 (relying on the statements made in Compl. ¶ 133). However, the language of the Paragraph 133 relied upon by Plaintiffs offers no support to Plaintiffs' instant contentions. Paragraph 133 reads as follows:

> On December 20, 2001 . . . FBF, blaming recession in the United States and in Argentina, slashed fourth quarter after[-]tax earnings by taking a charge [so it could] increase[] its loan loss reserves against loans that might not be repaid of $650 [m]illion. [FBF's] spokesman . . . . stated that the economic crisis in Argentina would cost [FBF] $150 million in the fourth quarter because [FBF] will have to write down certain Argentine debt it held by $75 million and set aside an additional $75 million for future Argentine loan losses.

Compl. ¶ 133.

Since the language of Paragraph 133 is fully dedicated to the issue of loan losses and loan loss reserves (i.e., increases of the loan loss reserve account and charges made against this account), and no statement made in Paragraph 133 relates to the issue of reclassification of loans as AHADS (or to any other issue unrelated to FBF's Argentine loan loss reserves), the Court cannot read Paragraph 133 as a statement offsetting Plaintiffs' umbrella admission that Plaintiffs' losses were caused solely by FBF's alleged misrepresentations with respect to the adequacy of FBF's Argentine loan loss reserves at the time of the FBF-Summit Merger. See Compl. ¶ 8.

Page 64 of 66

litigation") (citing <u>Goulding v. Feinglass</u>, 811 F.2d 1099, 1103 (7th Cir.), <u>cert. denied</u>, 482 U.S. 929 (1987)).

## IV. **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion to expand the class definition is construed as two separate motions, one made pursuant to Federal Rule of Civil Procedure 23(c)(1)(C) and seeking to amend the existing Certified Class Definition on the grounds that a fuller development of facts has rendered that Definition unsound, and another made pursuant to Rule 60(a) and seeking to correct a clerical error in the Certification Opinion and Order, and both Rule 23(c)(1)(C) and Rule 60(a) motions are GRANTED to the extent that the definition of Plaintiffs' class is amended to read:

> All persons or entities who: (1) exchanged shares of Summit Bancorp common stock for shares of FBF common stock in connection with the merger between FBF and Summit ("FBF-Summit Merger"), and pursuant to the registration statement and prospectus filed by FBF on or about January 25, 2001 for the shares it would be issuing in connection with the FBF-Summit Merger, *and* (2) sold such shares of FBF common stock during the period which (a) began when the investing public could have reasonably learned about the content of FBF's disclosure that was made on or after December 19, 2001, but (b) ended on the date which was the first day following November 6, 2003, and during which the FBF shares traded at the price equal to--or higher than--the price paid at the open market for FBF's shares on the date of the FBF-Summit Merger, *and* (3) sustained damages as a result of such transactions. Excluded from the class are Defendants; members of the Individual Defendants' immediate families; and director, officer, subsidiary, or affiliate of FBF; any entity in which any excluded person has a controlling interest; and their legal representatives, heirs, successors and assigns.

The part of Defendants' Motion for partial judgment on the pleadings filed pursuant to--but not amenable to examination under--Rule 12(c)  is construed as a motion made pursuant to Rule 60(b)(6) seeking a clarification of the holding reached by Judge Bassler in his Opinion and Order, and such Rule 60(b)(6) motion is GRANTED to the extent that the parties are provided with the

clarification stated herein.

      Plaintiffs' Application to amend the Complaint is DENIED for failure to meet the requirements of the "relation back" doctrine, as well as on the grounds of futility of the amendment.

      An appropriate Order accompanies this Opinion.


                                   s/ Garrett E. Brown, Jr.
                              **GARRETT E. BROWN, JR.**
                                 **Chief Judge**
                         **United States District Court**


Dated: November 28, 2007